## UNITED STATES v. ROBINSON.

### (District Court, S. D. New York. May 26, 1919.)

TREASON ☜13—PROSECUTION—EVIDENCE—OVERT ACT.

In view of the history relating to the provision of the United States Constitution that no person shall be convicted of treason unless on the testimony of two witnesses to the same overt act, as well as the debates at the time of the adoption of the provision, it is necessary to produce two direct witnesses to the whole overt act; and while it may be possible to piece bits together of the overt act, yet each part must have the support of two oaths, and hence conviction cannot be had on the testimony of one witness together with circumstantial evidence, though it was well-nigh conclusive.

At Law. J. Willard Robinson was indicted for treason. On motion to direct a verdict at the close of the government's case. Motion granted.

This is a motion to direct a verdict at the close of the government's case.

The defendant was indicted on January 20, 1919, for treason under three counts. The first alleged that after April 6, 1917, the defendant gave aid and comfort to the German government while war existed between it and the United States, by conveying messages, oral or in invisible ink, from the city of Halifax, Canada, to the city of Rotterdam, Holland, and communicating and delivering the same to agents and representatives of the German government, and in receiving in return oral and similarly written replies; that some of the messages delivered were given to the defendant by Maria K. de Victorica and Herman Wessels, who were, to the knowledge of the said defendant, secret agents and spies for, and secret representatives of, the German government, and that others of the messages were received from John T. Ryan and Jeremiah A. O'Leary, who were, to the knowledge of the defendant, conspiring with Victorica and Wessels; that the replies were in fact delivered to Victorica, Wessels, Ryan, and O'Leary; that the defendant further conspired with certain German agents in Holland to act as an agent and spy for the German government in the United States, and that they should send to him through the mails communications containing instructions concerning his conduct as such spy and other information to be delivered to Victorica and Wessels.

The overt acts laid under this count were four:

First, that the defendant, on the 16th of April, sailed from the city of Halifax with intent to convey to officials of the German government the original messages heretofore described, and with intent to obtain from those officials replies to be conveyed to Victorica, Wessels, Ryan, and O'Leary, in furtherance of the prosecution by the German government of its wars.

The second overt act was that on May 4th, in the city of Rotterdam, Holland, the defendant landed from a steamer with intent to communicate to officials of the German government the original messages

and to receive from them the messages to be reconveyed by him to Victorica, Wessels, Ryan, and O'Leary.

The third overt act was that on June 6, 1917, defendant embarked from the city of Rotterdam bound for New York, carrying with him the reply messages heretofore described, with intent to convey these to the agents of the German government, Victorica, Wessels, Ryan, and O'Leary, and with intent to act as a secret agent for the German government.

The fourth overt act was that between May 4th and June 3d, in Holland and other places on the continent of Europe, the defendant conspired with certain agents of the German government to act as a secret agent and spy for the German government, and that those agents should send to the defendant by messengers and through the mails communications containing instructions concerning his conduct and the conduct of Victorica and Wessels; also that the German agents did send to the defendant certain letters, one of which was written in invisible ink, and which were set forth in extenso in the indictment.

The second count alleged that the defendant gave aid and comfort to the German government by bringing into the United States certain messages for Victorica and Wessels, spies of the German government, and for Ryan and O'Leary, who were acting in conjunction with them, to the defendant's knowledge, and in concealing the identity of Victorica and Wessels, and in delivering the messages to Victorica, Wessels, Ryan, and O'Leary, and in consulting and advising with O'Leary.

There were four overt acts also laid in this count.

The first was that on June 20th the defendant arrived in New York with messages from the German government for Victorica, Wessels, Ryan, and O'Leary.

The second overt act was that from June 20th to June 22d he registered in New York hotels under a false name to conceal his identity and in order to facilitate his meeting with Victorica and O'Leary and to deliver the messages in question.

The third overt act was that on June 21st he met and conferred with O'Leary with the intent to report to O'Leary the result of his trip to Holland and to secure O'Leary's aid towards a meeting with Victorica.

The fourth overt act was that on August 17, 1917, he made a public speech in which he urged a large crowd of people to oppose the sending of troops by the United States to France.

The third count was a combination of the first and second and laid the overt acts theretofore set forth.

The defendant was brought on for trial before a petit jury on May 19, 1919, and the prosecution introduced the following testimony:

By Maria de Victorica that she was an agent of the propaganda division of the German Foreign Office, who came to this country in January, 1917, from Berlin, through Norway; that in March of that year she had an interview with the defendant at a restaurant in the city of New York along with O'Leary, the upshot of which was an agreement between them that the defendant should board ship for

Rotterdam, at which place he should get into communication with the German Consul General, whom he should tell that he came from the United States with an important message, and should request the Consul General to send a telegram to the German Admiralty; that they should arrange for the defendant to be taken into Germany, and to be met by some one there to whom he could give credentials; that the witness gave to the defendant the watchword "Agatit," and told him that the Consul General would not know anything about it, but that he was to request him to wire this word to the Admiralty, so that they might see that he was really a messenger; that he would be brought into communication with the Admiralty, and should tell them that he had been sent by the witness and by Wessels; that he should tell them that the witness' letters of recommendation had not yet arrived, and that therefore she had not been able to get in communication with anybody here; that she was much discouraged and disappointed with her efforts theretofore, but that she had got in touch with O'Leary and Ryan, of whom Ryan wished to know whether the three documents which had been submitted to Count von Bernstorff had arrived in the hands of the German government, and whether there was any reply to this document; that Ryan wanted to know whether it would be possible to send a submarine off the coast of Newport to take on board Irishmen who wished to get back to their government but were prevented from doing so by the English government.

The witness further testified that at the same time O'Leary sent word by the defendant that he knew the lawyer through whom the English were handling their "spy money" in this country, and he could put a man in his office if the German government was so interested; that the defendant should give an unfavorable description of the attitude of the German-Americans in this country.

The witness said that at the same time she had given to the defendant a Bible in the flyleaf of which was written in secret ink a message which he should deliver to the people who might meet him, the contents of which were not disclosed to the defendant, but which were in general accord with his oral instructions. The defendant had insisted that there should be nothing given him which would embarrass or harm the United States in any way, as he did not wish to be used as a messenger for any such purpose. The witness also told the defendant to advise the authorities that they should stop writing letters, as her correspondence was under surveillance, and she had reason to believe that letters were being intercepted. O'Leary joined strongly in this.

The defendant secured passage as a scullion on a tank steamer leaving New York on March 24, 1917, bound for Halifax. When a few days out of Halifax the steamer got word to return to Halifax because of the declaration of war between the United States and Germany, and did so. She left, however, on April 16th, and the defendant landed in Rotterdam, as alleged in the indictment, on May 4, 1917. His presence upon the ship was proved by the cook under whom he served, and several witnesses testified to his signing on as scullion in New York on March 24th as alleged.

His return on June 6, 1917, was proved ·by two passengers, who were in the second cabin along with him, and his presence in New York, registered under surreptitious names, was proved by a number of witnesses. Nothing was shown of what he had done in Rotterdam or anywhere else in Europe except that he had been met upon the street by one of the witnesses in clothes noticeably better than that which he possessed while on board.

Victorica also swore that she saw him in July of 1917 after his return, with O'Leary, at a table in a hotel in Long Island; that they took a motor together to an inn, and that he then delivered to her the reply messages which he had received. He said that he had come back safely as a passenger, but had not been allowed to enter Germany. Three persons had met him in Rotterdam and taken his message and given him another and had provided for his coming home. He gave back the Bible to Victorica, and told her that she would find three sheets of paper concealed in it, all written with invisible ink, two of them for Wessels and one for herself. He said that the messenger he had met in Germany told him that the outbreak of war between the United States and Germany had quite changed the situation. There could be no question of sending a submarine; that the German government wished to say that Germany was in full sympathy with the cause of the Irish freedom, but they did not think it advisable to interfere directly in Irish affairs, in accordance with the requests contained in the documents which the defendant had carried over; that they advised the Irish to wait for the Peace Conference, when Germany would take a firm stand for Ireland's rights; that they appreciated the help O'Leary had given to secure the services of the defendant, and the difficult situation of the Irish-Americans; that they did not expect the Irish-Americans to be disloyal to America, and that they cautioned Victorica and Wessels not to embarrass them here; that Germany expected the Irish-Americans to do their duty to the United States, and in case any were captured they would be given considerate treatment; that they should not use any more of the old secret ink, because the French government had learned to understand it, and that no more letters should be written by the witness from this side; that one "K." would start shortly from Germany, and come to the defendant, who was to put him in communication with Wessels.

The witness swore that she had developed the secret message for herself, which was to the effect that they were disappointed that her letters of recommendation here had not arrived; that they wanted her to come home directly, and not to go to South America, as originally intended; that one Kirscheisen was to arrive in America, and was to be taken to Wessels; that another man called Richards was to come, and he should also see Wessels through the help of the defendant and O'Leary.

In the spring of 1918 the defendant was shown to have kept himself in hiding in various places in the state of New York until his arrest on June 3, 1918. It was also shown that four letters were sent to him from Europe—one from Norway, one from Holland, one

from Denmark, and one from Spain. All these contained his correct address. Of these letters, one was delivered to the proposed carrier by one "Milton," who had a photograph of the defendant, and his correct name and address. The letter was written in invisible ink, and along with it there were delivered certain soft collars containing a new kind of invisible ink. The letter when developed was written in the German secret code, but its meaning was not disclosed. The soft collars in fact contained invisible ink. The letter from Holland was delivered to the proposed carrier by one De Jong, who gave the defendant's correct address. It was likewise in code, but not written in invisible ink, and it was mailed in America and reached the defendant's address. The other two letters were correctly addressed to the defendant and reached his house after his disappearance. They were in code, but their contents were not disclosed, nor was the name of the sender known.

At the close of this evidence the defendant moved for a verdict upon the ground that none of the overt acts, assuming any of them was sufficiently laid, were proved by two witnesses, as required by the Constitution, and that therefore, regardless of any other circumstances, the case must be taken from the jury.

Robert P. Stephenson and George W. Taylor, Asst. U. S. Atty., both of New York City, for the United States.

William Travers Jerome, of New York City, for defendant.

LEARNED HAND, District Judge (after stating the facts as above). The evidence in this case is amply sufficient to sustain a verdict for the government were the crime charged other than treason, and I shall confine myself, therefore, simply to the consideration of whether the rule has been satisfied which is peculiar to that crime; that is, whether any overt act of treason is supported by the testimony of two witnesses.

The words "overt act" go back to the original statute of the 25th Ed. III. Under chapter 3 of 21 Rich. II no overt act was necessary for two years, until it was again reintroduced by chapter 10 of the 1st of Hen. IV, the preamble to which indicates the reason for its restoration: "There was no man which did know how he ought to behave himself to do speak or say for doubt of such pains" (of treason). It is clear that men feared prosecutions pieced together inferentially from chance words or deeds which need not be charged and against which no preparation could be made. Even in the times of Hen. VIII, when the law of treason was extended to its extremest limit, the provision was retained of some overt act, or at least some written or spoken words which evinced the traitorous design. That design was indeed the substance of the act of compassing, and, in spite of the long history of distortion which compassing endured, the logic of the relation between the overt act and the crime was kept sound. In short, the treason must be manifested by some open deed, whose happening necessarily involved the commission of the crime. This was probably what the original words meant.

259 F.—44

In cases of adhering to the enemy the same consistency was not observed. Strictly no overt act should have been held sufficient which merely manifested a traitorous intent, because the treason lay in hostile acts, for the words "adhering" must be taken as defined by the phrase, "giving aid and comfort." It was hardly the purpose of the 25th of Ed. III to allow the treason of levying war or of adhering to the enemy to be proved merely as attempt; nor is there a sound reason for supposing that the overt act was meant only to disclose a traitorous intent in treasons which involved more than intent. Probably the analogy with compassing confused the subject, but, whatever the cause, it was decided before the end of the seventeenth century (Lord Preston's Case, 12 How. St. Tr. 646) that aid and comfort need not reach the enemy, and that, though the accused were frustrated in his attempt, it was enough if the overt act declared his intent. This has since remained the law. Rex v. Hensey, 1 Burr. 643, 19 How. St. Tr. 1342; Rex v. Stone, 25 How. St. Tr. 1171; United States v. Greathouse, 4 Sawy. 457, Fed. Cas. No. 15,254.

Nevertheless a question may indeed be raised whether the prosecution may lay as an overt act a step taken in execution of the traitorous design, innocent in itself, and getting its treasonable character only from some covert and undeclared intent. It is true that in prosecutions for conspiracy under our federal statute it is well settled that any step in performance of the conspiracy is enough, though it is innocent except for its relation to the agreement. I doubt very much whether that rule has any application to the case of treason, where the requirement affected the character of the pleading and proof, rather than accorded a season of repentance before the crime should be complete. Lord Reading in his charge in Casement's Case uses language which accords with my understanding:

"Overt acts are such acts as manifest a criminal intention and tend towards the accomplishment of the criminal object. They are acts by which the purpose is manifested and the means by which it is intended to be fulfilled."

Therefore I have the gravest doubt of the sufficiency of the first and second overt acts of the first count and of those of the second count, which consist of acts that do not openly manifest any treason. Their traitorous character depends upon a covert design, and as such it is difficult for me to see how they can conform to the requirement. However, the point is not necessary to a decision of the case, because, though properly laid, they are proved in the same way as the third overt act of the first count, which is good as a pleading under any rule.

The critical question, therefore, is whether it is enough to prove one element of the overt act by one witness, and another by another. It was not until chapter 12 of the 1st, and chapter 11 of the 5th and 6th, of Ed. VI that there had ever been introduced into the law of treason any quantitative rule of proof. Later, chapter 10 of the 1st and 2d of P. & M. raised a question which I need not consider because the law was settled definitely in favor of the quantitative rule by chapter 1 of the 13th of Car. II. In the trial of the Regicides (Kelyng, 9) it was decided that the statute permitted one witness to one overt act and another to another; and twenty years later, in Lord Stafford's

Case (T. Raymond, 407, 408), all the judges accepted the same rule. Therefore when in 1695 the same was declared by statute (7th Wm. III) it was only a recognition of what had long been the accepted practice.

The requirement of two witnesses probably had its rise from the canon law (Lord Stafford's Case, T. Raymond, 408); and in fact heresy and treason were necessarily regarded as closely analogous at a time when the axiom was everywhere accepted, cujus regio, ejus religio. It was the rule of canon law, borrowed from the civil, that two witnesses were ordinarily necessary (Burns, Ecclesiastical Law, vol. 3, p. 304), and whether it had any genuine roots in Roman law it is not necessary to consider. Such a procedural requirement, wherever it comes from, implies a system of trial not rational in its processes at all, one in which the cause was tried by the sacramental nature of the oath itself (Wigmore, § 2032), one where the witnesses were guarantors or sponsors for the parties (Imperatoris Iustiniani Institutiones, Moyle, pp. 632, 633). This idea, common enough in archaic law, was preserved in the later civil and in the canon law. It would be a complete misunderstanding to suppose that when applied to treason it only meant that the prosecution's witnesses to any overt act should number at least two. In the sense of the rule he is not a witness who testifies only to an isolated and neutral fact, which is relevant because it rationally corroborates the story of a direct witness. When evidence is estimated quantitatively it is the support of the oath that counts, and the witness is no neutral narrator of past truth. He is "on the side" of him who calls him; he is of "his tail," as it were, of his array against the opposite array. It is, of course, quite true that in the ultimate test the jury will decide rationally; but I have now to consider only this formal requirement, which had its origin in other and wholly different ideas, and under which a witness is only he who can "back up" the story of the party to whom he belongs. Treason requires two such witnesses to the overt act. It has on this account always been necessary to produce direct, and not enough to produce circumstantial, proof. Rex v. Lowick, 13 How. St. Tr. 267, 305; Burr's Case, 25 Fed. Cas. 55, 176. And so, taken historically, there seems to me no doubt as to the correctness of the defendant's position.

There is, however, a further argument which comes near to demonstration. I have spoken of the origin of the second alternative of the 7th of Wm. III, which first, so far as I know, was applied in the Regicides Case, 1660. A similar development in the law of heresy, which, as I have shown, is nearly akin, is of much importance. As trials for heresy were conducted under the canon law, it was in theory necessary that the charge should be proved by two witnesses; but very early the craving to secure convictions at any cost led to precisely the same expedient, eventually legalized in the sixteenth century, as took place in England in respect of treason in the seventeenth. While the canon law required two "contestes," and while it was laid down distinctly by Escobar that heresy might not be proved by one testis to one declaration of the accused and another to another, nevertheless

exactly that practice, i. e., contestes in genere, became prevalent and was finally authoritatively recognized in 1590.[1]

This development of the rule of contestes, both in heresy and treason, shows that the pressure of necessity substituted as an avowed, though an unorthodox, equivalent, separate oaths to two separate instances ("overt acts") of the same general character. Yet each of these oaths must directly support one of the several instances ("overt acts"). Moreover, it was always the rule in treason that the jury must believe both witnesses. Rex v. Castelmaine, 7 How. St. Tr. 1067, 1111, 1112. It scarcely needs much historical imagination to see that, if such an expedient were chosen as a relief from the stringency of the law as it stood, it could only have been because the existing rule demanded the support by two witnesses of all the facts making up the specific charge (the "overt act"). If it meant no more than that one direct witness must be corroborated in the sense that later and more rational procedure understands that word, no need for the equivalent devised as such relief could ever have existed. It is, of course, much harder to obtain one direct witness to each of two several instances than a corroborating witness to some innocent detail of the story of a single witness. Indeed, no prosecution has much chance of success without some corroboration, and the rule, if so interpreted, means in practice nothing whatever.

The original draft of the Constitution upon which the debates took place contained no other requirement than that "no person should be convicted" unless "on the testimony of two witnesses," following the Statutes of Ed. VI. The debate occurred on August 20, 1787, and so far as was reported in Madison's Journal (Doc. Hist. of U. S. vol. 3, pages 568–571) contains no allusion to the practice which had in-

[1] Lea, History Spanish Inquisition, vol. II, pp. 562–563, Book VI, c. 5:
"The theory that it required two witnesses to prove a fact was developed into the rule that they must be contestes—that is, two witnesses to the same individual act of heresy—before it could be accepted as proved. It is often found urged in the argument for the defense that the witnesses are singulares and not contestes; but in practice such a defence was usually disregarded, or at most only led to the unfailing resource of torture. * * *

"Even in the seventeenth century Escobar affirms the rule absolutely; if one witness swears that he heard Pedro say in the market place that God is not a Trinity, and another that he heard him say so in a house, it does not convict him, for neither fact is legally proved. Such a definition, however, threw too many obstacles in the way of the prosecution not to be eluded, and in fact there were classes of cases, such as solicitation in the confessional, in which it was impossible to have more than one witness to each individual act. So, in prosecutions for Judaism, in which evidence frequently covered a long series of years and infinitesimal incidents in daily life, concurrent witnesses to any single one could scarce be had. Yet the claims of the Inquisition to extreme benignity required this to be understood, as Escobar expresses it, while in practice it was disregarded. It was discovered that witnesses could be contestes in genere when they testified to different acts of heresy and thus make full proof. It is true that Rojas, after citing authorities on both sides, concludes that the rule requiring two concurrent witnesses to a fact must be observed; but one of his authorities asserts that the contrary is the rule in practise; and the Suprema affirmed this July 27, 1590, by ordering that, where formal heresy is concerned, depositions as to different ceremonies and points of faith are to be held as contestes."

terpreted this language exactly as the 7th of Wm. III provided. Mr. Dickinson raised the question whether the proposed change should include both alternatives of the 7th of Wm. III, i. e., two witnesses to the same overt act, or one to one and another to another. It was decided to add only the first of these, though, as James Wilson observed, "treason may sometimes be practised in such a manner as to render proof extremely difficult, as in a traitorous correspondence with the enemy"—an observation prophetic of the situation here at bar. The Constitution, therefore, though quite unwittingly, restored the rule to what was probably its original form in England, and was certainly the °original and orthodox form for prosecutions for heresy. More-over, the convention intended to establish the stricter of the two alter-natives permissible under the 7th of Wm. III, to whose penalties the delegates had indeed nearly all been liable. Whether they did wisely in declining to observe James Wilson's warning is not to the point; they meant to take over less than they found, but in the form they found it, and they accomplished what they intended.

The authorities offered in support of the opposite view do not seem to me persuasive. They are two: First, a ruling of Mr. Justice Paterson in United States v. Mitchell, 2 Dall. 348, Fed. Cas. No. 15,788; and, second, the case of Regina v. McCafferty, 10 Cox, Cr. Cas. 603. Justice Paterson's ruling in U. S. v. Mitchell is not wholly clear. He may have meant that the assemblage at Couch's Fort, which moved toward Gen. Neville's, was in itself an overt act of levy-ing war, and, if so, as he says, it was amply proved. He seems to have preferred the interpretation of the whole act as one; that is, the assemblage at Couch's Fort and the attack upon Gen. Neville's house. If the attack upon the house was an essential part of the act, it must be confessed that there were not two witnesses to each substantial part; for the second witness to the acts at Gen. Neville's said no more than that it ran in his head he had seen the defendant there. There can, however, be little doubt that in fact the assemblage in warlike posture, and the advance to the attack, was a sufficient act of levying war, al-though hostilities had not yet actually begun, and so much was con-ceded on all sides in Burr's Case. If more was intended it can scarce-ly be held to be an authority for so much.

Regina v. McCafferty, supra, seems to me no authority for the doc-trine that one may tack together the testimony of two witnesses to separate parts of the same overt act. The statute there applicable was the 7th of Wm. III, and six judgments were written. Of these, one (Keogh, J.,) does not deal with the point, and two (O'Brien, J., and Piget, C. B.) expressly declined to recognize such a doctrine. George J., seems to have proceeded upon that clause of the statute which permits the proof of two overt acts by separate witnesses, relying up-on the informer, Corydon, for only the conspiracy at Chester. O'Ha-gan, J., relied upon the informer for the conspiracy at Chester, and thought that "one or more of the overt acts" had been proved by many witnesses. He seems to me to lend no countenance to the theory that the testimony can be tacked. The same is not true of the judg-

ment of Fitzgerald, J., who in one part held that the rising in Dublin was sufficiently proved by several witnesses to the rising, and that the informer's testimony to the defendant's connection with it might be proved by him alone. Yet in another part of his opinion he seems to suppose that the fourth and fifth overt acts of coming to Ireland with others and their assemblage there might be treated as separate, and that they were independently proved. His position is therefore not wholly consistent.

Finally it may be urged that the rule in perjury is an analogy which should be followed, since it quickly became rationalized into requiring only corroboration of a single direct witness. No doubt the rule in perjury was in its origin also canonical (Wigmore, § 2040); but it seems not wholly clear to me that it first got recognition in the common-law courts only a century after the Star Chamber was abolished. It is at least open to argument that already in Star Chamber the rule had suffered some abatement by the growth of a more rationalizing habit, and that its fate oscillated later between growing rational methods and literal obedience to a rule whose origin was not understood, and for which, as so often happens, a false explanation had been devised. At most, I can see no more in the analogy than that in perjury the rule has suffered change, while in treason it has not, and Wigmore, a high authority, clearly supposes that the rule in treason has not become like that in perjury. Section 2042.

I conclude, therefore, that it is necessary to produce two direct witnesses to the whole overt act. It may be possible to piece bits together of the overt act, but, if so, each bit must have the support of two oaths; on that I say nothing. In the case of none of the overt acts at bar was the necessary evidence produced. The gravamen of the charge depended for direct support on Victorica alone. For the rest, the case rested upon circumstantial evidence, which, while well-nigh conclusive in fact, was not direct as required. There seems to me no question whatever that without disregarding the whole theory of the Constitution I could not allow a verdict to stand if I received it. I must therefore direct it for the defendant.