## STEPHAN v. UNITED STATES.
### No. 9337.

Circuit Court of Appeals, Sixth Circuit.
Feb. 6, 1943.

As Amended Feb. 19, 1943.
Writ of Certiorari Denied April 5, 1943.
See 63 S.Ct. 858, 87 L.Ed. ——.

Nicholas Salowich, of Detroit, Mich., and James E. McCabe, of Nashville, Tenn., for appellant.

John W. Babcock, of Detroit, Mich. (John C. Lehr and John W. Babcock, both of Detroit, Mich., on the brief), for appellee.

Before HICKS, ALLEN, HAMILTON, MARTIN, and McALLISTER, Circuit Judges.

HICKS, Circuit Judge.

Appellant was convicted of treason and sentenced to death by hanging. There are twenty-five assignments of error, some of which raise questions not presented to the court below and others of which are not discussed in the brief, nor called to our attention in the oral argument. However,

the case involves a penalty of death for appellant, and we shall proceed upon the exception to the general rule and shall notice possible error, although the questions may not properly be raised. See Wiborg v. United States, 163 U.S. 632, 658, 16 S.Ct. 1127, 1197, 41 L.Ed. 289; Crawford v. United States, 212 U.S. 183, 194, 29 S.Ct. 260, 53 L.Ed. 465, 15 Ann.Cas. 392.

It is urged that the indictment does not charge the offense of treason with sufficient certainty, and particularly that the allegations of overt acts are not clear.

■ Treason is the most serious offense that may be committed against the United States, Hanauer v. Doane, 12 Wall. 342, 79 U.S. 342, 347, 20 L.Ed. 439; In re Charge to Grand Jury, 30 Fed.Cas. pages 1024, 1025, No. 18269; and its gravity is emphasized by the fact that it is the only crime defined by the Constitution. The constitutional definition [Art. 3, Sec. 3, Cl. 1] is: "Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. * * *"

■ The phrase "in levying War against them" is not here involved. This definition is meticulously exclusive and that it was so intended is indicated by the use of the adverb "only." The Constitution has left no room for constructive treason and Congress could not and has not undertaken to restrict or enlarge the constitutional definition.

The statute upon which the indictment is based is as follows: "Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere is guilty of treason." (R.S. Sec. 5331; March 4, 1909, C. 321, Sec. 1, 35 Stat. 1088; U.S.C.A. Title 18, c. 1, Sec. 1.)

The statute follows the Constitution and designates the class of persons subject to its provisions, to wit, "whoever, owing allegiance to the United States, * * *."

Section 2 of the statute provides the punishment for treason.

The indictment charged—that appellant, a citizen of, and a person owing allegiance to, the United States, did at and within the City of Detroit, County of Wayne, State of Michigan, Eastern District of Michigan and the United States of America, continuously and at all times during the 18th and 19th days of April, A. D. 1942, unlawfully, feloniously, wilfully, traitorously and treasonably adhere to one Hans Peter Krug, a secret agent and spy for, and a secret representative of the Government of Germany in the furthering and carrying on of its war against the United States, and an officer in the Army of the Government of Germany who had escaped from a war prisoners' camp in Ontario, Canada; and that the adherence of appellant to Krug, and the giving of aid and comfort by appellant to Krug during April 18th and 19th, 1942, consisted: in his receiving and treating with Krug, in his furnishing hospitality and entertainment to Krug, in his furnishing to and obtaining for Krug money, necessities of life and personal effects, in his harboring Krug, in his concealing the identity of Krug, in his giving false information to citizens of the United States and others with the intent to conceal the identity of Krug, in his arranging for and providing transportation of Krug in and about Detroit, Michigan, and means of transportation for Krug from Detroit, Michigan, to Chicago, Illinois, and in his failure to report to proper public and military officials the presence in the United States of Krug; and that appellant, when so adhering to and giving aid and comfort to Krug, well knew all of the facts stated in the indictment.

■ The indictment is sufficient. United States v. Behrman, 258 U.S. 280, 42 S.Ct. 303, 66 L.Ed. 619; Hagner v. United States, 285 U.S. 427, 431, 52 S.Ct. 417, 76 L.Ed. 861; Dierkes v. United States, 6 Cir., 274 F. 75. It distinctly and clearly alleges each and every element of the offense necessary to be charged, including time, place and circumstances, and advised appellant of the charge he was required to meet, to wit, that he had unlawfully, feloniously, traitorously, treasonably, knowingly and intentionally adhered to and given aid and comfort to Peter Krug, an enemy of the United States, and in furtherance thereof had committed certain overt and manifest acts. These alleged overt acts, twelve in number, were set out in the indictment with exact and careful detail.

Appellant insists that the court erred in denying his motion for a directed verdict. This involves the question, (1) whether the constitutional provision [Art. 3, Sec. 3, Cl. 1] that "No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the *same* overt Act, * * *." [italics ours] has been met, see

United States v. Robinson, D.C., 259 F. 685; Wharton's Crim.Law, 11th Ed., vol. 3, Sec. 2155; Wigmore on Ev., 3rd Ed., vol. 7, Sec. 2038; and if met (2) whether there was substantial evidence to support the verdict. There was no material conflict in the evidence. Appellant cross-examined witnesses for the Government but introduced no testimony on his own behalf.

The evidence discloses that appellant was admitted to citizenship in the United States on June 24, 1935, and took the oath of allegiance on June 28, 1935. The oath is as follows: "I hereby declare on oath that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state or sovereignty, and particularly to Germany of whom (1) I have heretofore been a subject or citizen; that I will support and defend the Constitution and laws of the United States of America against all enemies foreign and domestic; that I will bear true faith and allegiance to the United States of America, and that I take this obligation freely without any mental reservation or purposes of evasion, so help me God."

The Government's principal witness was Hans Peter Krug. He testified that he was a citizen of the Government of Germany and an officer, an "Oberlieutnant," in the German Air Force; that on August 28, 1940, he was piloting a bombing plane over England, with which country Germany was then at war; that he was shot down and captured; that he was injured, was taken to a hospital and afterwards, in January 1941, was transferred to an internment camp for war prisoners near Nays, Ontario; that in November 1941, he was transferred to an officers' camp at Bowmanville, Ontario, from which he escaped on April 17, 1942. His escape was confirmed by the testimony of two Canadian officers stationed at the camp. With the aid of forged papers and the assistance of a priest, who was influenced by false stories, he reached Windsor, Ontario, and proceeded by means of a stolen boat, across the river to Detroit. About 9:00 or 9:30 on the next morning, April 18, dressed in coveralls, he made his way to 259 Phillip Ave., Detroit, the home of a Mrs. Bertelmann, whose name and address he had obtained from his fellow prisoners. At his urgent behest, she admitted Krug to her home and he identified himself by showing her the epaulets of a German officer.

Mrs. Bertelmann was born in Germany, was married there in 1920, and came to Canada in 1928. Her husband, also a German, became an American citizen in 1930 but she never applied for citizenship. She had done knitting for the German war prisoners in Canada and had, through appellant, purchased tobacco and other articles to send to them. She testified that it was required that the name and address of the sender should be attached to these packages.

Krug testified that when he told Mrs. Bertelmann that he was "Oberlieutnant Krug," escaped from Canada, she telephoned appellant, whom she styled as a friend of hers, and said, "that he was coming over." There is evidence that in this telephone conversation Mrs. Bertelmann told appellant that she had a German prisoner in her home. Mrs. Bertelmann testified that when she realized that Krug was a German prisoner, escaped from Canada, she was scared, because she knew that it was not right to have him in her house; that when she told appellant upon his arrival that she had a German prisoner, he chided her for her agitation and said, "what are you shaking for?—You're crazy." Krug testified that when appellant came into the kitchen where he was, appellant sat down, "held his hands on the upper part of his legs and smiled."

There was some question on Krug's part whether he told appellant the whole story of his escape then or later in appellant's restaurant, although it appears from both his and Mrs. Bertelmann's testimony that Krug spoke to them both at some length of his experiences after his escape from Bowmanville. Mrs. Bertelmann, who was passing back and forth through the kitchen during this conversation, testified that she heard appellant ask, "Why don't you give up, you haven't a chance?" and that Krug replied, "I have to try, because on account of treatments over there." On cross-examination Krug revealed that appellant told him that it would be impossible for him to go back to Germany by way of South America, and that he should go back where he came from. Later he testified that he didn't know at which place they were when appellant said that to him.

Krug testified that before he left Mrs. Bertelmann's she gave him $20 in money, some shoes, socks and underwear. Her testimony was that there was a pair of shoes on the kitchen floor and when it ap-

peared that the sole of one of Krug's shoes was broken, appellant said, "Do you think those fit?" and then asked her if she had any socks, and when she brought a pair of knitted socks, appellant said, "Those are too long," and she then provided Krug with a pair she had darned for her husband. She testified that appellant then asked Krug, "What are you wearing underneath?" and that he showed that he had no underwear, whereupon she supplied him with underwear which she had planned to send to Canada. Asked by appellant whether she had any money, that he, appellant, had come away so fast that he didn't bring any with him, she replied that she had $20 and laid it on the kitchen table, near appellant, and although she didn't see appellant take it, the money was gone when the man left, nor did she see appellant give any money to Krug. The latter, on the other hand, stated categorically that he did not recall any discussions between appellant and Mrs. Bertelmann about money, socks, underwear or shoes.

Krug testified that when he left Mrs. Bertelmann's he went from her apartment with appellant, to appellant's car, got in and drove to appellant's restaurant. Mrs. Bertelmann testified that she watched them leave the apartment together, observed them go to appellant's car and saw appellant open the door. She did not see them get in, although she assumed that they did.

■■ We must keep in mind that one may not be convicted of treason upon evidence of an overt act, unless such act has been laid in the indictment. Burr's Trial, United States v. Burr, 25 Fed.Cas. page 55, No. 14,693; Wharton's Crim. Law, 11th Ed., vol. 3, Sec. 2153, p. 2310. Further, although not explicitly set forth in either the constitutional or statutory provisions, an intent to give aid and comfort to the enemy is an essential element of the crime of treason. United States v. Werner, D. C., 247 F. 708, 709; United States v. Fricke, D.C., 259 F. 673, 676; cf. United States v. Burr, C.C., 25 Fed.Cas. pages 52, 54, No. 14,692h; United States v. Burr, C.C., 25 Fed.Cas. pages 55, 90, No. 14,693; see United States v. Robinson, supra. Without an intent to give aid and comfort to the enemy, there is no treason. Wimmer v. United States, 6 Cir., 264 F. 11.

Overt acts Nos. (1), (2) and (3) as charged in the indictment, are briefly as follows:

(1) That Stephan traveled by automobile on April 18, 1942, from his home to the home of Mrs. Bertelmann, "for the purpose of taking * * * Peter Krug under * * * his protective care, and *for the purpose of giving and with the intent to give said enemy Krug, aid and comfort.*" (Words similar to those italicized conclude the allegation of each overt act.)

(2) That Stephan on April 18, 1942, obtained from Mrs. Bertelmann money of the United States for the use and benefit of Krug.

(3) That Stephan on April 18, 1942, escorted Krug from Mrs. Bertelmann's home to the automobile then being used by Stephan.

As to overt act (1), there is evidence, as hereinbefore pointed out, that Mrs. Bertelmann talked to appellant by telephone, and that he arrived ten minutes or a quarter of an hour later and that it would have taken around a half hour to come by street car. Krug's estimate was that it was a half to three quarters of an hour after the telephone call before appellant appeared. Krug did not see a car in front of the house when he came in. An inference might have been drawn by the jury that Mrs. Bertelmann reached appellant on the telephone and that he must have come in his car since it was standing in front of the house. But even so, such an inference could hardly be based upon testimony by two witnesses.

There is a confusion of testimony regarding overt act (2) which hardly appears to have been proven by the testimony of two witnesses.

Overt act (3) was legally proven because both Krug and Mrs. Bertelmann were in accord that appellant escorted Krug from her house to the car appellant was using.

■ A failure to establish all the overt acts alleged is not fatal upon a motion for peremptory instructions. If one or more of such acts have been established, all others may be disregarded as surplusage. Wharton's Crim. Law, supra, at page 2310; Wharton's Crim. Ev., 10th ed., vol. 1, Sec. 131, p. 355.

Krug and appellant drove from Mrs. Bertelmann's to appellant's restaurant at 7209 Jefferson Avenue. Appellant went in the back way and directed Krug to enter by the front entrance. Krug did so and sat down at a table and appellant came over

to him and Krug ordered food but did not pay for it. Appellant told Krug that he was busy and Krug took a walk down town, returning to the restaurant about the middle of the afternoon, when appellant said, "Now, I have nothing to do and it is your birthday today and we will take a pleasure trip," Krug having told appellant at Mrs. Bertelmann's that April 18 was his birthday. Appellant gave Krug a necktie and billfold and on the trip outfitted him with a small traveling bag.

It was in the course of this short trip that the second series of overt acts alleged, numbered (7), (8) and (9) in the indictment, took place:

(7) That Stephan on April 18, 1942, escorted Krug to Haller's cafe in Detroit, and bought a drink for Krug and himself, and concealed the identity of Krug by introducing him as "one of the Meyers boys" for the purpose of concealing Krug's identity.

(8) That Stephan on April 18, 1942, escorted Krug to the Progressive Club in Detroit, there buying drinks for Krug and himself, and concealing the identity of Krug "as a friend of his from Milwaukee."

(9) That Stephan on April 18, 1942, escorted Krug to the place of business of Theodore Donay in Detroit, introducing Donay to Krug, who then related to Donay the incidents of his escape, his version of prison conditions in the prison camp in Ontario and of the intended future travel of Krug, at which place Stephan purchased candy for Krug and obtained money from Donay which was given to Krug for his use.

The first place visited was a business house engaged in renting glassware and crockery. Krug remained in the car but while appellant was in the building he had the proprietor make a telephone call for him concerning the departure of trains for Chicago and the fare between the two cities. Then the bag was bought; next they went to a restaurant where each had beer and whiskey. Krug testified that appellant talked in English to the man behind the counter and "may be * * * told him that I am a friend * * * of his from Milwaukee." At this place, which was not identified by Krug by name, Krug left his bag and had to return for it. The place is identified, by the incident of the forgotten bag, as Haller's Cafe. August Haller, who operated this place at 1407

Randolph, testified that Krug, whom he identified from photographs introduced by the Government, was introduced by appellant as one of the Meyers boys. He testified that appellant did not seem disturbed; and on the other hand, that he did not reveal Krug's real identity.

Next they went to a coffee shop or social club, where Krug had coffee and cake. Krug testified that appellant did not talk to anybody at this place. The second witness to this incident was Joseph McGuire, patron of the Progressive Hall. He identified Krug from the photographs. He testified that they ordered a couple of "shells of beer," took a couple of sips and left after five or ten minutes. Krug was not introduced. Some time during the afternoon they went to the place of business of one Donay, where appellant styled Donay a friend of his, after which Krug introduced himself as "Oberlieutnant Krug." Krug testified that he told of his escape from Bowmanville, of conditions at the camp there, of a man who had been shot there, and of his intention to make his way back to Germany. While there, he testified, appellant bought some candy and gave it to him. Krug also obtained $20 at this place which came from Donay's cash drawer, but he could not recall whether appellant actually gave him the money or whether Donay himself handed it to him. Krug could not recall that he saw any other person, clerks or customers in Donay's place. On cross-examination he testified that Donay gave him the $20.

The confirmatory witness to overt act (9) is one Rintelen, clerk in the business house of Donay. He knew appellant and identified Krug from his photographs. He testified that the two came in and appellant asked to see Donay, whereupon the three, standing close together, "engaged in an important conversation which they held secretly." He saw appellant purchase the candy and saw Donay go to his cash drawer and when he next looked Donay was walking back to the others. The next day Rintelen found a slip for $20.68 in the cash drawer, indicating that Donay had withdrawn that amount.

Of these three alleged overt acts we think that (7) was sufficiently proven by the testimony of the two witnesses Krug and Haller. The place was fixed by the circumstance of the forgotten bag and although there was divergence as to whether Krug was introduced as one of the Meyers boys,

or as from Milwaukee, it is clear enough that appellant purposely concealed Krug's identity.

Overt act (8) is not so clear, for, although it is reasonably certain that both Krug and McGuire were thinking of the Progressive Club, Krug never identified it by name and there was no other happening from which it could be recognized. Further, we think that the proof of overt act (9) falls short. Rintelen overheard no consecutive part of the conversation that took place between Krug and Donay and we find nothing in his testimony from which a jury could be certain of what was said between them. The circumstances indicate with certainty that the Donay incident occurred but it cannot be established by vague testimony of one witness, plus circumstantial evidence. See United States v. Robinson, supra, 259 F. page 694.

The trip ended with appellant and Krug returning to appellant's restaurant around 6:00 or 6:30 P. M. Here, it appears from the testimony of Krug and of a waitress, Erna Schwartz, that Krug ate a meal and sat around the restaurant until about 9:00 P. M., when he was let out the back door to go to the Field Hotel. During this period Krug sat at a booth and ordered food for which he did not pay. Later he sat at another table and a young couple and another young man sat down with him. He was not introduced to them by name but testified that so far as he could recall appellant introduced him as a friend from Milwaukee. The young couple, Karl and Eva Erhardt, testified. Neither would positively identify Krug from photographs as the man who sat with them at the table; but later Mrs. Erhardt was confronted with Krug in person in the courtroom and she then identified him as the man who had been at the table with them. Each recalled that appellant had pointed Krug out as a friend from Milwaukee. While they were at the table with Krug they spoke to him, but testified that he soon got up and left. The testimony of Erna Schwartz throws some doubt as to whether she or appellant served Krug the evening meal and whether Krug paid for it. She testified that she served Krug a glass of beer and some food and that he paid for it, although she was not sure.

We think that overt act (11), which in the indictment was alleged as follows: (11) That Stephan in the evening hours of April 18, 1942, escorted Krug to his place of business where he entertained him at dinner, giving him food and drink, and concealing his identity by introducing him as a man from Milwaukee—was sufficiently proved. There is no question that Krug was served a meal there and that appellant concealed his identity.

Overt act (12) averred as follows: (12) That Stephan on April 18, 1942, gave orders to others in arranging that Krug should register as a guest at the Field Hotel, Detroit, Michigan, and spend the night as a guest there—was not relied upon by the Government in its brief as proven by two witnesses. Nevertheless, we think it was so supported.

Krug testified that he and appellant talked about where he should spend the night and appellant proposed that he stay in the nearby Field Hotel. Erna Schwartz testified that appellant told her that Krug was a German fellow from Canada, and that appellant asked where he should put him to sleep for one night. Mrs. Schwartz testified that she told appellant she had a vacant room in her house and offered to put him up there for one night, but that appellant said, "Oh, I think he can go in Field Hotel to sleep."

Krug did spend the night in the Field Hotel, being let out of the restaurant at the rear door by Mrs. Schwartz to go there. He came to the door of the restaurant about 8 o'clock the next morning by prearrangement with appellant who had looked up the bus schedule to Chicago. They drove down town, had breakfast together and appellant bought for Krug a bus ticket to Chicago.

We come now to the question of intent. Was there substantial evidence that appellant intended to adhere to Krug, an enemy of the United States, giving him aid and comfort?

Proof by two witnesses of criminal intent is not necessary. It may be proved by one or more witnesses, or by circumstances, or by a single fact. United States v. Fries, 9 Fed.Cas. pages 924, 931, No. 5,127. Krug was an "enemy" as that term is used in the constitutional clause defining treason. He was the subject of a foreign power in a state of open hostility with us. United States v. Greathouse, C. C., 26 Fed.Cas. page 18, No. 15,254; see also United States v. Fricke, supra. We had been at war with the German Reich since December 11, 1941.

There is substantial evidence found not only in appellant's confession, hereafter to be considered, but in the testimony of Mrs. Bertelmann that appellant knew that Krug was an escaped German prisoner, even before he went to the Bertelmann house; and Krug testified that appellant smiled when he first confronted him. There is evidence from Krug's testimony that the latter told appellant his whole story and of his purpose and intention to attempt to get to Germany through the United States and that when he arrived in Germany he intended to inform the German Government about all the events which had happened during the time he was a prisoner in Canada, about conditions in Canada and about the treatment of officers and men in the Canadian prison camps, and that he also intended to rejoin the German air force. Krug advised appellant that he desired to go to or through Chicago and he further testified, and appellant admitted, in the signed statement before referred to, that he checked the bus schedules for Krug, bought the traveling bag for him, went to the station with him and bought his ticket. This and other testimony hereinbefore recited supply proof that appellant, fully cognizant of Krug's identity and plans almost from the outset, willingly and without stint gave of his time and substance to the furtherance of Krug's plans and substantially support the finding of the jury of appellant's treasonable intent as charged in the indictment.

The motion for peremptory instructions was properly denied.

 Appellant contends that because Krug was an officer in the German Luftwaffe and an adherent to Nazi principles, he was therefore so infamous as to bar him from giving testimony and that the court should not have permitted him to testify. This proposition was not raised at the trial, and was probably waived by appellant's cross-examination of Krug. However, we think it not improper to discuss it briefly.

 When a witness takes the stand to testify, the law presumes that he is a competent witness and incompetency must be shown by the party objecting to him. Wharton on Crim.Ev., 10th ed., vol. I, Sec. 358, p. 721.

 It is said that Krug was incompetent as a witness under the laws of Michigan and that the federal courts are bound thereby. Granted that this was the old rule, an important exception has been engrafted upon it. In Funk v. United States, 290 U.S. 371, 54 S.Ct. 212, 78 L. Ed. 369, 93 A.L.R. 1136, the court said in substance that in criminal cases federal courts are not bound by such rules but that in the development of truth they are to apply them as they have been modified by changed conditions. But, all this to one side, we have been cited to no law of Michigan or decision of any federal court, that a German Army officer, although imbued with Naziism, is disqualified to give evidence in a court of justice and we make no such decision now.

 It is urged that because Krug came to the witness stand dressed in the full uniform of an officer of the German Army and gave the Nazi salute he should have at once been disqualified by the court as a witness. Again this complaint is raised here for the first time. We find no evidence in the record that Krug was so attired or that he gave the salute. However, in the argument of the District Attorney there was reference to Krug's dress and behavior. But, assume the fact, the manner and demeanor of the witness was relevant in determining the weight and credibility to be given to his testimony by the jury. It did not require, in the reasonable exercise of the court's discretion, his disqualification and rejection altogether. The court in its charge might have been somewhat more specific with reference to the effect of Krug's misconduct, if in fact there was such misconduct, but there was no exception whatever to the charge.

The appellant complains of the failure of the court to compel Krug to answer certain questions on cross-examination, or in the alternative, to strike his entire testimony.

The questions he refused to answer on cross-examination on the grounds that they involved a military secret were, (1) "How much money, if any, did you have when you arrived in Detroit?"; (2) "How much money, if any, did you have on your person when you left Detroit on the 19th of April?"; (3) "Will you state to the jury, if you can, what part of the City of Detroit you landed in when you first landed from Canada?"; (4) re: the clothes he was wearing when he arrived in Detroit; "And underneath the coveralls did you have a suit of clothes, a coat and a pair of pants?"; (5) "How much did you

have when you arrived at San Antonio?"; (6) with reference to his membership in the Luftwaffe, he refused to give the number of "any particular battalion or squadron or section"; (7) with reference to a piece of cardboard with writing thereon in his own handwriting which was found on him in San Antonio, he was asked, "What does it say? What does it say on there?" to which he replied, "I won't read it."

Immediately following his refusal to answer the first question of those enumerated, the court interposed to say, "It is a proper question. * * * I don't see that can be * * * any military secret. * * *" To which the prisoner answered: "I am sorry. I can't answer this question because I can't tell Canadian officials if it is possible or if it is not possible for a prisoner of war to get some money, and if I tell it I had a lot of money with me then they know that in any way I got some money in the prison camp, and if I tell No, I had no money with me, then they know too that there is no way that the prisoners gets some money. Do you understand what I mean? So I can't answer his question."

The court then reiterated its opinion that it involved no military secret and was a proper question, "relevant to the direct examination." Counsel for the appellant then said: "I think we should have a ruling here at this time whether this witness, having submitted himself voluntarily as a witness in this case, stands on any different footing than any other witness who refuses to answer a question when the court rules that it is a proper question." The court replied: "Well, not as a matter of law, but from a practical standpoint as a prisoner of war he stands in a very different situation. It is much the same situation as I once had with other witnesses who were serving a life time in Jackson Prison. * * * I just didn't know what I could do. If anybody can tell me, why I welcome the information." No exception was taken and counsel continued cross-examination.

In explanation of his refusal to answer the second enumerated question, the prisoner defined a military secret as follows: "A military secret, when we make an escape all the facts in connection with an escape are military secrets, because every single thing which we do and which happens during an escape give information to the enemy how we handle such an escape and how we are able to escape, and

how we are able to make our way to the states and so on."

Later in the cross-examination counsel for appellant in addressing Krug said, "You understand from your knowledge of international law that there is no power on earth that can make you testify in this law suit unless you wanted to; you know that," to which Krug answered, "That is right."

Then Krug said his purpose in testifying was "to clear about that he (Stephan) didn't do what he is charged with. I was only asked to tell the truth about the case and which is wrong, what FBI has charged him and all other persons who are charged with having known who I am."

Krug had earlier on direct examination refused to answer the following questions because they were military secrets: (1) "How long have you been serving as an officer of the * * * German Air Force?"; (2) in connection with the clothing he was wearing when he went to Mrs. Bertelmann's he was asked, "What was the other clothing?" to which he replied: "* * * I can't tell you how I was dressed to make my escape"; (3) "Now, after you got to Chicago, how long did you stay there, Lieutenant?"; (4) "Now why did you go to New York?" In connection with his refusal to answer this question he stated later that his trip to New York was in connection with his purpose to get out of the country and back to Germany.

Finally, on redirect examination, when he was being asked by Government counsel about the circumstances of the conversation with Donay, Krug interrupted and addressed the court. He asked, "Your Honor, would you be good enough to answer a question?" Krug said, "The defender of Mr. Stephan told me that I stayed and testified against Stephan. If that is so, I will be relieved from further questioning." The court then said to the stenographer, "Will you read what he said" and Krug's answer was read. Krug then said: "I don't intend to testify against Stephan. I was told by the FBI agents that I have only to clear out the facts and to tell the truth, and nothing but the truth." The court responded: "That is what you are sworn to do. * * * I have nothing to do with whom the testimony helps or who it harms. * * * That is what you took your affirmation to do * * * to tell the truth and so that

is what I say to you should do, is tell the truth. You may go ahead." But the witness said: "I have another objection. I asked the FBI agents that I never can testify against a man who helped me, but they told me about when I made this question that there is no testifying against him, but it is only in statement of the facts he already has told."

The court reiterated that it couldn't decide who was harmed, that it was only to see that witnesses told the truth and directed counsel to proceed. Krug again interrupted, "Of course I tell the truth, but when * * *," to which the court responded, "Well, all right. There is nothing for me to do, you see."

Thereupon counsel for both parties stated they had no further questions and the witness was excused.

The refusal of Krug to answer these few questions propounded to him was not objected to, and fewer still were of any relevance on the question of appellant's guilt; but keeping in mind that this is a capital case, we think that appellant has sufficiently raised the question whether, upon his failure to answer on cross-examination, Krug's entire testimony should have been stricken out.

The general rule is that "where the witness after his examination in chief on the stand has refused to submit to cross-examination, the opportunity of thus probing and testing his statements has substantially failed and his direct testimony should be struck out." Wigmore on Ev., supra, Sec. 1391, p. 112, and cases cited in the footnotes. But to this general rule there are many exceptions. One is that "on the circumstances of the case, the refusal or evasion of answers to one or more questions only need not lead to this result." Wigmore further states, "Courts treat this situation with varying degrees of strictness. It should be left to the determination of the trial judge, regard being had chiefly to the motive of the witness and materiality of the answer." See Gibson v. Goldthwaite, 7 Ala. 281, 42 Am.Dec. 592; Flannery v. Commonwealth, Ky., 51 S.W. 572; Scott v. McCann, 76 Md. 47, 24 A. 536; Succession of Townsend, 40 La.Ann. 66, 3 So. 488.

Krug had been brought into court from a prison in Canada in the custody of Canadian military authorities. As indicated by the court's remarks, it felt that it could not punish Krug by imprisonment for refusing to answer, because he was already a prisoner. That Krug must have sensed this situation is clear, not only from his own statement but from the statement of the court made in his presence. The record leaves no doubt that Krug had no intention of testifying to anything which might prove detrimental to appellant. He was probably influenced to some extent by a representation made to him by some one in the interest of appellant, "that I stayed and testified against Stephan." That such a representation was made is uncontradicted and its occurrence is unexplained. The record fails to show when, or where, or particularly by whom it was made to Krug, whether during the noon recess or at some other time. Krug had been on the witness stand before the recess and his revelation that some one had approached him took place after his return to the witness stand in the afternoon. But, regardless of the circumstances under which Krug was approached, there can be no other conclusion than that the object of the warning to him of the effect of his previous testimony was to influence to the prejudice of the Government any further testimony by him as the Government's witness. Under the circumstances it was the duty of the court to do that which in its judicial discretion would effectuate the ends of justice and prevent injustice, and we find no reversible error in its refusal to strike the testimony of Krug.

Appellant complains of the admission of alleged incompetent, irrelevant, immaterial and obscene testimony. Reference is specifically had to what is called the Von Werra matter. This related to a story which Krug told to Donay in the presence of appellant about a German lieutenant who was captured in New York City but finally got back to Germany and was killed in action. All this was purely hearsay and had no bearing upon appellant's case. A reversal may not be had for the admission of purely irrelevant hearsay evidence.

It is urged that the testimony of the Government's witnesses, Alvina Ludlow and Ethel Merrifield, was incompetent and prejudicial. The testimony of these two women related to a visit made to an assignation house by Krug and appellant on

April 18. The entire testimony of these witnesses was stricken by the court with the admonition,—"Forget those two women and forget their testimony, strike it out, leave it entirely out as if they hadn't been called."

It is argued that the testimony of the Government's witness Jack O. Parker was incompetent and prejudicial. Parker's testimony related to alleged declarations of Krug subsequent to his departure from Detroit. Parker's testimony as to these statements and made when Krug was recaptured at San Antonio was also stricken with directions to the jury to disregard it.

■ In view of the court's instructions, we need not consider whether the evidence of these three witnesses was inadmissible. There is nothing to indicate that the jury disobeyed the injunction to disregard their testimony. See New York, L. E. & W. R. Co. v. Madison, 123 U.S. 524, 8 S.Ct. 246, 31 L.Ed. 258; Turner v. Amer. Sec. & Tr. Co., 213 U.S. 257, 29 S.Ct. 420, 53 L. Ed. 788.

The testimony of the Government's witness, Gasteiger, was not important. It amounted to nothing more than the opinion of an expert witness as to the meaning of certain writing on a paper found in the possession of Krug at the time of his arrest.

■ There was nothing improper in admitting certain exhibits, to wit, epaulets, a Greyhound Bus Company map, a copy of "Matthews Atlas of the World at War" and a revolver and cartridges taken from Krug at the time of his recapture. These exhibits were relevant to Krug's own testimony that he was trying to get back to Germany and reenter the German Air Force. The weight to be given to them was for the jury.

It is assigned as error that the court failed to declare a mistrial because the District Attorney in his closing argument (1) made repeated references to appellant's failure to produce witnesses; (2) made the direct statement that appellant had not taken the stand; and (3) made intemperate, improper and inflammatory remarks to the prejudice of appellant's substantial rights.

■ In one particular counsel labors under a misapprehension. A careful reading of the record indicates clearly that at no time in his argument did the District Attorney make the statement that appellant had not taken the stand. With reference to appellant's failure to produce witnesses the District Attorney, in response to the argument of counsel for appellant, said: "Well, if he knew anything about Lieutenant Krug, or if he had that evidence to show that Lieutenant Krug was lying, or was telling a falsehood on the stand, why in the name of Heaven didn't he bring some witnesses in here to contradict what Krug said?" This was objected to as improper argument and the objection sustained. The court said: "I will say to the jury right there that you should pay no attention,—I will have to charge you later that that is the law,—to the fact that he hasn't taken the witness stand or that he hasn't produced witnesses." Any impropriety in this line of argument was cured. Dunlop v. United States, 165 U.S. 486, 498, 17 S.Ct. 375, 41 L.Ed. 799; Chadwick v. United States, 6 Cir., 141 F. 225, 244.

■ The District Attorney in his closing argument also said:

"But, ladies and gentlemen, it was not the Government of the United States that was trying to get Lieutenant Krug back to Germany so he could get up in a bomber and come over here and bomb the United States of America, that was Max Stephan that did that.

"And that is why, ladies and gentlemen of the jury, he is a traitor, a blackhearted traitor, if there ever was one."

We do not regard this statement as an unequivocal, unrelated denunciation of appellant as a traitor. The statement was made in connection with that part of the evidence tending to show that appellant was endeavoring to aid Krug in his effort to rejoin the air force of the enemy and it was not objected to and we cannot assume that it caused prejudice. The use of the word "blackhearted" was unfortunate, but we are not here dealing with a weak case (Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314) nor with such gross and persistent conduct as characterized the argument therein. We have said [Knable v. United States, 6 Cir., 9 F.2d 567, 570]: "'This court has never regarded with favor arguments by a district attorney calculated to inflame the minds of the jurors and prejudice them against the accused. On the other hand, the district attorney has

the right, and it is no doubt his duty, so long as he confines his argument to the evidence in the case, to present the government's side of the case in forcible and direct language.' Remus v. United States [6 Cir.], 291 F. [501], at page 511."

The Supreme Court, even in a capital case (Crumpton v. United States, 138 U.S. 361, 11 S.Ct. 355, 356, 34 L.Ed. 958), has said: "There is no doubt that, in the excitement of an argument, counsel do sometimes make statements which are not fully justified by the evidence. This is not such an error, however, as will necessarily vitiate the verdict or require a new trial. It is the duty of the defendant's counsel at once to call the attention of the court to the objectionable remarks, and request his interposition, and, in case of refusal, to note an exception."

It is urged that the charge of the court did not (1) clearly define the crime of treason; (2) what is meant by "an overt act"; and (3) what constituted "adhering to the enemy, giving them aid and comfort." Laying to one side the fact that there was no objection to the charge, we have carefully examined it and find these criticisms without merit. Treason was exactly defined in the charge in accordance with both the Constitution and the statute, and the elements "overt act" and "adhering to the enemy, giving them aid and comfort" were carefully set forth in accordance with applicable law.

▉ In the indictment, Krug, in addition to being described as a subject of the Government of Germany and a member of its armed military forces, was alleged also to be a "secret agent for, spy for and secret representative" of the Government of Germany. The entire indictment, including this allegation, was read to the jury by the court in connection with the charge. Appellant insists that this was prejudicial since the jury would naturally regard these allegations as evidence that Krug was in fact a spy. We think the contention is without merit. If the possibility existed that the jury would be so misled, we must assume, in the absence of any evidence to the contrary, that it was dispelled by the court's express declaration in its charge that the indictment was not evidence.

▉ As indicated herein, on April 20, 1942, an officer of the Federal Bureau of Investigation took a written statement from appellant in the nature of a detrimental confession or admission, which statement was received in evidence late in the trial. It is nowhere claimed that the statement was not freely, voluntarily and understandingly made, but the proposition is pressed upon us that the court should have explained to the jury that it was not a "Confession in open Court" [Constitution, Art. 3, Sec. 3, Cl. 1] upon which, standing alone, appellant might be convicted. The contention is without weight, in view of the court's repeated emphasis in its instructions to the jury, that appellant could not be convicted except upon proof of *intent, and proof* that appellant did something to carry out that intent, that is to say, committed at least one overt act to be established by the testimony of *two* witnesses.

The jury was permitted to separate during the trial. Appellant urges that it should have been sequestered.

▉ This appeal was heard by us on December 12, 1942. On December 5th appellee filed a motion with this court to be permitted to file a supplemental bill of exceptions to the effect, that after the jury was sworn counsel both for the appellant and the Government, in the absence of the jury, were requested by the court to advise it whether they desired that the jury be sequestered and counsel responded that they did not so desire; that this was not done publicly so as to become a part of the transcript of record, in order to avoid any possible prejudice resulting against any attorney who might desire such sequestration. This supplementary matter contains painstakingly careful instructions and caution to the jury to guard themselves against any possible outside influence.

There appearing to us no reason to deny this motion, it is herewith granted. See Rules of Practice and Procedure in Criminal Cases, rule IX Bill of Exceptions, 18 U.S.C.A. following section 688. 292 U.S. page 664, 54 S.Ct. XXXIX; Ray v. United States, 301 U.S. 158, 165, 57 S.Ct. 700, 81 L.Ed. 976. But this to one side, there is nothing to indicate that appellant was in the least prejudiced by the separation of the jury. Holt v. United States, 218 U.S. 245, 251, 31 S.Ct. 2, 54 L.Ed. 1021, 20 Ann.Cas. 1138; Brown v. United States, 69 App.D.C. 96, 99 F.2d 131, 132; Ader v. United States, 7 Cir., 284 F. 13, 30.

Upon appellant's conviction it was the duty of the court to fix and adjudge the punishment. The statute provides that "whoever is convicted of treason shall suffer death; or, *at the discretion of the court,* shall be imprisoned not less than five years and fined not less than $10,000 * * *." (Italics ours.) Title 18, Ch. 1, Sec. 2, U.S.C.A. To aid it in the discharge of its duty and in order that the court might feel certain that the sentence to be imposed was a just and proper one, the Judge on one occasion at the request of appellant's wife, had an interview with her. On another occasion he had an interview with the appellant, his wife and a friend. On these occasions the interviews took such direction as the appellant and his wife desired. In addition to these interviews the Judge had other conversations with representatives of the Federal Bureau of Investigation and the Chief Probation Officer as well as with counsel for appellant and the United States Attorneys who prosecuted the case.

The record indicates that these various interviews took place in the Chambers of the Judge. The information thus made available is set forth in great length in connection with the sentence. Appellant insists that this procedure was improper. We take judicial notice that the practice of presentence investigations has long been followed in district courts. See Tractenberg v. United States, 53 App.D.C. 396, 293 F. 476, 480; Stobble v. United States, 7 Cir., 91 F.2d 69, 71; Sharp v. United States, 4 Cir., 55 F.2d 227. See also Title 18, Ch. 22, Sec. 727, U.S.C.A., which makes it the duty of a probation officer to investigate any case referred to him for investigation by the court and his further duty to perform such other duties as the court may direct. The Rules of Practice and Procedure in Criminal Cases, supra, 292 U.S. page 661, 54 S.Ct. XXXVII, under the heading "I. Sentence" also clearly recognize not only the propriety but the importance of such investigation. We think, however, that such information should have been disclosed to the Judge in open court and in the presence of appellant. Such appears to have been the practice in the cases cited. We think that the interest of convicted persons about to be sentenced is more carefully safeguarded by open hearings under such rules as the court may adopt. But the real question here is, whether upon the record as we find it, there was an abuse of judicial discretion in fixing the sentence and we find none.

Finally, after a careful and painstaking review of this entire record, we are unable to find any reversible error.

The judgment is affirmed.