## UNITED STATES v. FRICKE.

### (District Court, S. D. New York. April 25, 1919.)

1. TREASON ☞13—OFFENSES—CONVICTION.

Before the jury can find defendant guilty of treason they must determine that under the evidence treason has been committed by defendant beyond a reasonable doubt.

2. TREASON ☞10—OFFENSES—ALLEGIANCE.

Within Const. art. 3, § 3, Cr. Code, § 1 (Comp. St. § 10165), denouncing the offense of treason, every citizen of the United States, whether by birth or naturalization, owes allegiance to the United States, and if such a citizen adheres to the enemies of the United States, giving them aid and comfort, he is guilty.

3. TREASON ☞6—OFFENSES—"ENEMIES."

On declaration of a state of war between the United States and Germany, subjects of Germany became enemies of the United States, and remained enemies during the continuance of war, within Const. art. 3, § 3, Cr. Code, § 1 (Comp. St. § 10165), denouncing as treason the adhering to the enemies of the United States and giving them aid and comfort.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Enemy.]

4. TREASON ☞6—OFFENSES—GIVING AID AND COMFORT.

Within Const. art. 3, § 3, Cr. Code, § 1 (Comp. St. § 10165), denouncing as treason the adhering to the enemies of the United States, giving them aid and comfort. any American citizen who commits an act which weakens, or tends to weaken, the power of the United States to resist or attack its enemies, is giving them aid and comfort; and where, after declaration of war with Germany, defendant harbored or concealed the identity of a known German spy, or supplied him with funds, or attempted to assist him in any way to carry out his mission, he is guilty.

5. TREASON ☞3, 6—OFFENSES—GIVING AID AND COMFORT.

In determining whether defendant, who was charged with treason in adhering to and giving aid and comfort to enemies of the United States, was guilty, the question of intent is a vital ingredient of the crime; and though he assisted an enemy alien, whom he knew to be such, he is not guilty where he intended merely to assist him as an individual, and not to give aid and comfort to enemies of the United States.

6. TREASON ☞1, 13—OFFENSES—"OVERT ACT."

The crime of treason denounced by Const. art. 3, § 3, Cr. Code, § 1 (Comp. St. § 10165), cannot be committed unless there be an overt act, which is an act in furtherance of the crime, which consists either in levying war or adhering to the enemies of the United States, etc., and such act must be proved by two witnesses.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Overt Act; Treason.]

7. TREASON ☞13—OFFENSES—OVERT ACT—WITNESSES.

Where, in a prosecution for treason, the overt act is single, continuous and composite, made up of and proved by several circumstances, and passing through several stages, it is not necessary to satisfy the provisions of Const. art. 3, § 3, requiring two witnesses, that there be two witnesses to each circumstance in each stage, as distinguished from the necessary proof of two witnesses to an act other than continuous and composite.

8. TREASON ☞6—OFFENSES—WHAT CONSTITUTES.

Though defendant aided a German spy, who came to the United States prior to the declaration of war with the sinister purpose of interfering with commerce of the United States with the Allied Nations, defendant

cannot be convicted for such acts, and a conviction for treason can only be had where it was shown that he adhered to the enemies of the United States by giving aid and comfort to such spy after declaration of war between the United States and Germany.

9. CRIMINAL LAW ⊜⇒517(1)—CONFESSION—ADMISSIBILITY.

A confession must be full, free, and voluntary, and there must be nothing about it which involves duress.

Albert Paul Fricke was indicted for treason.

Francis G. Caffey, U. S. Atty., of New York City.
Thos. J. O'Neill, of New York City, for defendant.

MAYER, District Judge. Stated briefly, the following is the charge in the indictment against Fricke:

The grand jurors present (this is the second count, the only count left in the case, as you know) that Albert Paul Fricke, at and within the city, county, and state of New York, within the Southern district of New York, and within the United States, continuously and at all times from April 6, 1917, to October 29, 1918, under circumstances, conditions, and in the manner and by the means hereinafter set forth, then and there being a citizen of the United States, and a person owing allegiance to the United States, in violation of his said duty of allegiance, unlawfully, feloniously, willfully, traitorously, and treasonably did knowingly adhere to an enemy of the United States, to wit, to one Hermann Wessels, otherwise called Carl Rodiger, or Carl Roediger, or Haro Schroejers, who was then and there an enemy of the United States, to wit, a subject of the Emperor of Germany, and a member of the naval forces of the Imperial German Government (with which the United States at all times since April 6, 1917, have been at war), and a secret agent for, and a spy for, and a secret representative of, said Imperial German Government in the furthering and carrying on of its war against the United States, the said Wessels throughout said period residing in the city, county, state, and Southern district of New York, giving to said enemy, Hermann Wessels, aid and comfort, that is to say:

"That said adherence of said Albert Paul Fricke to said Hermann Wessels, an enemy of the United States as aforesaid, and said giving of aid and comfort by said Fricke to the same from April 6, 1917, to October 29, 1918, consisted in his receiving and treating with said Hermann Wessels, and in his harboring the said Hermann Wessels, and in his concealing the identity of the said Hermann Wessels, and in his giving to officials, agents, and employés of the United States, false information known to him to be false regarding said Hermann Wessels, with intent to harbor said Wessels, to conceal his identity, and to conceal the fact that said Wessels was a secret agent for, and spy for, and secret representative of, the Imperial German Government, and in his supplying funds to, and procuring and endeavoring to procure funds for, said Hermann Wessels."

That, in substance and effect, is the charge of the indictment. It concludes with the words, "he, the said Albert Paul Fricke, when so adhering to, and giving aid and comfort to, said Hermann Wessels as such enemy of the United States, well knowing all the facts stated in this indictment."

I have omitted from this count any reference to such matters as I have excluded from consideration.

Then the indictment proceeds:

"That in the prosecution, performance, and execution of said treason, and of said traitorous and treasonable adhering and giving aid and comfort to

said Hermann Wessels, an enemy of the United States as aforesaid, said Albert Paul Fricke, at the several times in that behalf hereinafter set forth in the specification thereof (being times when said United States were at war with said Imperial German Government as aforesaid, and being times when said Hermann Wessels was an enemy of the United States), in said city, county, state, and district, unlawfully, feloniously, willfully, traitorously, treasonably, knowingly, and with intent to adhere to and give aid and comfort to the said Hermann Wessels, did do certain overt and manifest acts; that is to say, * * * ."

And then are recited the overt acts to which I will refer later.

[1] You must first determine whether on the evidence treason has been committed by this defendant beyond a reasonable doubt, and you need not concern yourselves with the subject of the overt acts until and unless you are satisfied beyond a reasonable doubt that the government has shown that the defendant was guilty of treason as I shall define treason.

Of course, I do not mean by what I have said to control the mental method of arriving at a conclusion. You must first be satisfied that the defendant has committed treason beyond a reasonable doubt before there will be any necessity of concerning yourselves with some of the other questions which would arise.

[2] The Constitution, art. 3, § 3, says:

"Treason against the United States shall consist only in levying war against them, or in adhering to their enemies [of the United States], giving them aid and comfort. No person shall be convicted of treason unless on the testimony of two witnesses to the same overt act or on confession in open court."

The United States Criminal Code, § 1, provides:

"Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason." Act March 4, 1909, c. 321, 35 Stat. 1088 (Comp. St. § 10165).

In this case there is no charge of levying war, so the charge is that the defendant adhered to Hermann Wessels, alias Rodiger, an enemy of the United States, giving the enemy aid and comfort within the United States.

So far as is applicable to this case, every citizen of the United States, whether by birth or naturalization, as a matter of law, owes allegiance to the United States.

If, therefore, the defendant, Albert Paul Fricke, during the period he is charged with committing the offense in this indictment, was a citizen of the United States, then by reason of that fact he owed allegiance to the United States.

[3] On the breaking out of the war between the United States and the Imperial German Government, the subjects of the Emperor of Germany were enemies of the United States, and remained such enemies during the continuance of the war; all members of the military and naval forces of the Imperial German Government, and all persons engaged by or working for the Imperial German Government as agents or spies, to assist the Imperial German Government in the prosecution of its war, or to hamper the United States in the prosecu-

tion of its war against the Imperial German Government, are enemies of the United States.

[4] Remembering the words, "adhering to its enemies, giving them aid and comfort," all of those elements are necessary to constitute the crime. There must be the adherence, there must be the giving of aid, and there must be the giving of comfort; and in general, when war exists, any act which, by fair construction, is directed in furtherance of the hostile designs of the enemies of the United States, and gives them aid and comfort, or if that is the natural effect of the act, it is treasonable in its character if an American citizen does an act which strengthens, or tends to strengthen, the enemies of the United States in the conduct of a war against the United States; that is, in law, giving aid and comfort to' the enemies of the United States.

If an American citizen commits an act which weakens, or tends to weaken, the power of the United States to resist or to attack the enemies of the United States, that is in law giving aid and comfort to the enemies of the United States.

Applying these principles to the indictment in this case, if Hermann Wessels, or Carl Rodiger, as he is called, was an agent or a spy of the Imperial German Government in this country, for the purpose of assisting the Imperial German Government in the prosecution of its war, or in hampering the United States in the prosecution of its war against the Imperial German Government, and Fricke knew this fact, and with such knowledge Fricke harbored Wessels or concealed his identity, or supplied him with funds, or assisted or attempted to assist him in any way which might be useful in his mission to this country, that would be giving aid and comfort.

[5] The intent of the defendant, however, is a vital ingredient of the crime, and a vital means of ascertaining whether the crime charged was committed.

If not satisfied beyond a reasonable doubt that the defendant's intention and purpose in acting as he did was evil—that is, if not satisfied beyond a reasonable doubt that he intended to aid and comfort the enemies of the United States—and if not satisfied that that was his object, the defendant must be found not guilty.

If the defendant's intention in doing what he did after April 6, 1917, was not in any way to injure this country's interest, but merely to assist Rodiger or Wessels as an individual, he must be found not guilty—assisting him as an individual, as distinguished from assisting him in his purposes, if such there existed, of aiding the Imperial German Government, or of injuring the United States of America.

[6] The crime of treason, however, cannot be committed unless there be an overt act, and that overt act must be proved by at least two witnesses.

It is unnecessary to dilate upon the reasons for that provision, but it is always interesting and helpful perhaps to understand briefly the reasons. That was a very necessary safeguard in the opinion of the Constitution makers.

The class of treason with which we are dealing in this case only takes place, and only can take place, during war—when war is on. Naturally, passion is high; patriotic men and women are concerned with the safety of their country; and in the excitement it is but human nature sometimes to lose sight of the calm requirements of the law, and convict, as the expression goes, on general principles; and so, to safeguard against anything of that kind, and in order to prevent the conviction of any man for what he had in his mind, as distinguished from what he did, the constitutional provision as to an overt act was inserted; and that of course must be carried out by Congress, and that of course is the law.

An overt act in itself may be a perfectly innocent act standing by itself; it must be in some manner in furtherance of the crime.

So that brings me to the question of overt acts. Under the law of treason it is necessary, before a person can be convicted, that there be some overt act; in other words, a person cannot be convicted of treason merely for having the intention in his own mind to adhere to and give aid and comfort to the enemy. This intention must be manifested by what is termed an overt act.

The second count of this indictment contains 16 overt acts. The government has failed to prove by two witnesses overt acts Nos. 4, 5, 7, 8, 9, 11, 12, 13, 14, 15, and 16.

Before the defendant can be convicted, it is necessary for the prosecution to prove the commission of at least one of the overt acts numbered 1, 2, 3, 6, or 10 by two witnesses; it is not necessary to prove all of them. In other words, if you are satisfied beyond a reasonable doubt that the defendant is guilty of treason, you may convict, provided you are satisfied beyond a reasonable doubt that one overt act was committed.

[7] Where the overt act is single, continuous, and composite, made up of, or proved by, several circumstances, and passing through several stages, it is not necessary, in order to satisfy the provisions of the Constitution requiring two witnesses to an overt act, that there should be two witnesses to each circumstance at each stage, as distinguished from the necessary proof of two witnesses to an act other than continuous and composite.

That means this: If one of the overt acts, we will say, was as in this case the sending of a telephone message, and you have the testimony of the telephone operator who received the message for transmission, and the testimony of the person to whom the message was transmitted, there are the stages of one transaction proved by two witnesses, as the one witness was at one end of the telephone and the other witness at another.

Overt act No. 1 reads:

"Said Albert Paul Fricke, from April 6, 1917, to April 18, 1917, held, and caused to be held, on deposit with the Bank of the Manhattan Company, in the name of F. Ad. Richter & Co., of New York, for use of said Hermann Wessels, six thousand dollars, the said six thousand dollars being the balance of the proceeds of a credit of ten thousand dollars theretofore, to the knowledge of said Fricke, effected and transmitted to the United States from Germany, intending to deliver the same to said Wessels from time to time, and while

the said Wessels should be an enemy as aforesaid of the United States, with the intent and purpose on the part of said Fricke that said Wessels should use said money in furtherance of his acting, as aforesaid, as a secret agent for, and spy for, and secret representative of, said Imperial German Government in the furthering and carrying on of its war against the United States."

On that overt act there is the testimony of Charles E. West, Mortimer Witt, and Harold Powelson, the clerk in the Manhattan Bank. It is for you to say whether their testimony proved this overt act which has to do with this remainder of the deposit in the Bank of Manhattan.

Overt act No. 2 reads as follows:

"Said Albert Paul Fricke, from April 18, 1917, to September 6, 1917, delivered and caused to be delivered to said Hermann Wessels six thousand dollars, being the proceeds of said six thousand dollars heretofore described as held and caused to be held on deposit with the Bank of the Manhattan Company, in the name of F. Ad. Richter & Co., of New York, to be used, and intended by said Fricke to be used, by said Wessels as he, the said Wessels, might determine, and be advised and directed in furtherance of said Wessel's acting as aforesaid as a secret agent for, and spy for, and secret representative of, said Imperial German Government in the furthering and carrying on of its war against the United States, the said delivery being made in the following amounts on the following dates: April 18, 1917, one thousand dollars; May 1, 1917, one thousand dollars; May 31, 1917, one thousand dollars; June 29, 1917, one thousand dollars; August 8, 1917, one thousand dollars; September 6, 1917, one thousand dollars."

That is the count that refers to the delivery of the money. The witnesses who testified concerning this act were Charles E. West, Mortimer Witt, George H. Nickl, the paying teller of the Manhattan Bank, and E. B. Lilly, the paying teller of the Manhattan Bank, who took Mr. Nickl's place when Mr. Nickl was away.

It is for you to say, upon the evidence of those witnesses, as to whether that act has been proved.

Overt act No. 3 is as follows:

"Said Albert Paul Fricke, on August 28, 1917, borrowed from the Bank of the Manhattan Company three thousand dollars, with intent on the part of said Fricke to advance and deliver the same to said Hermann Wessels from time to time, and while the said Wessels should be an enemy as aforesaid of the United States, with the intent and purpose on the part of said Fricke that the same should be used by said Wessels in furtherance of said Wessels' acting as aforesaid as a secret agent for, and spy for, and secret representative of, said Imperial German Government, in the furthering and carrying on of its war against the United States."

That has to do, with the $3,000 borrowed by Fricke from the Manhattan Company. The witnesses to that are Mr. Forster, the cashier of the Manhattan Bank; H. M. Bucklin, the loan clerk of the Manhattan Bank; Harold Powelson, clerk in the Manhattan Bank; and James A. Coe, the office boy of Richter & Co.

It is for you to say, on the evidence, whether you are satisfied, as in all the cases of the overt acts, beyond a reasonable doubt, that that and the preceding acts have been proved.

Overt act No. 6 reads as follows:

"Said Albert Paul Fricke, on July 28, 1917, for and on behalf of said Hermann Wessels, enemy as aforesaid, sent and caused to be sent a cablegram

to Olten, Switzerland, directed to F. Ad. Richter & Company, of the tenor following:

"'July 28, 1917.

" 'F. Ad. Richter & Co., Olten, Switzerland:

" 'Require money.                                           F. Ad. Richter & Co.'

—the said Fricke intending thereby to cause a message to be sent to the aforesaid Adolf Richter in Germany, and to the Imperial German Government, informing them that money was required, and further intending thereby to secure from said Adolf Richter and from said Imperial German Government money and funds for the use of said Hermann Wessels in furtherance of said Wessel's acting, as aforesaid, as a secret agent for, and spy for, and secret representative of, said Imperial German Government in the furthering and carrying on of its war against the United States."

The witnesses who testified to the sending of this cablegram were Mrs. Anna Wedemeyer, of Liberty, N. Y.; Miss Hazel Rampe, the telephone operator; John F. Murray, clerk of the telephone company; Charles E. West; Mortimer Witt; and Robert H. Walls, operator of the cable company.

It is for you to say whether you are satisfied beyond a reasonable doubt that the overt act of sending this cablegram by Fricke has been proven.

Overt act No. 10 is the act that arises out of the May 3d statement, and I will come to that a little later.

So we have it briefly as follows: Up to November, 1916, so far as this record shows, the defendant, Fricke, who was the New York manager of F. Ad. Richter & Co., of Berlin, was a quiet, orderly, law-abiding man. He had been duly and properly naturalized, and he owed allegiance to this country.

From the outbreak of the European war, in 1914, up to November, 1916, so far as this case goes, he was pursuing his occupation in his usual fashion, attending to his business. Testimony has been produced that he was a man of good character, with the highest reputation for truth and veracity.

On the 11th day of November, 1916, the man Rodiger appeared in this country.

There was a Carl Rodiger, or there was supposed to be a Carl Rodiger, who was a genuine Carl Rodiger, who was the head of the Swiss branch of F. Ad. Richter & Co.

There is no dispute between the prosecution and the defense that Fricke believed that the genuine Carl Rodiger was about to arrive in this country. But when a man came it was in due course made known to Fricke that the real Rodiger was not here, and that in his place was a man who had entered this country with the aid of a false passport, and that the man was some one other than Rodiger.

Fricke, in a statement signed by him on June 15, 1915, said:

"In October, 1916, I received a cablegram from the branch office of Richter & Co., in Copenhagen, signed by Mr. Koffel:

" 'Rodiger, of Olten branch, will arrive on S. S. Christianiafjord. Notify Binder, of Behrens & Company, 95 Broad street, in reference to will.'

"(Wording is the best of my recollection.) I carried original cablegram around in my pocket and must have destroyed it. The above is the gist of it. The mention of the will was undoubtedly made to make the message pass the censor or give Rodiger a plausible excuse.

"I was mystified, but went over to Behrens & Co., whom I did not know. I went into the private office of Mr. Behrens, and showed him the cablegram. Behrens, who was very curt and grouchy, turned me over to Mr. Binder in the outer office. I introduced myself, and gave him the cablegram to read. He did not seem to understand the meaning of the message or the purpose of Rodiger's visit, and we decided to await Rodiger's arrival.

"The steamer arrived in port, but it was not until a week or ten days later that one afternoon Rodiger called at my office, introducing himself as Mr. Rodiger, showing me a paper with his photograph, which appeared to be a Swiss passport, and explaining his late call by the fact that while cutting his toe nail he had injured a toe, which prevented him from walking. He was limping. Whether it was affected or not I do not know. He said he had come in a taxi, and his taxi was waiting for him downstairs.

"He further said he came from Mr. Richter, whom he had met in Berlin in the office or building of the Admiralstab.

"That Mr. Richter was excused from military service, and had been drafted by the Intelligence Service (or some such organization) as his branch offices in neutral countries (Rotterdam, Copenhagen, Olten) offered him good grounds for crossing the borders. And further said that Mr. Richter had wanted to come to America himself on a U-boat, but that the idea was given up. Rodiger said 'I am not the real Rodiger of Olten,' although the real man has left Switzerland on the day stated in the passport. I cannot tell you my real name.' And he never did, and I never asked him for it."

If this statement of Fricke's is correct, then it appears that quite early Fricke knew that this was not the Rodiger of Olten but another man. Omitting other portions for brevity, the statement continues:

"During November and the first part of December he called once or twice a week. On one of these visits he said: 'I am to investigate if it is possible to place Irish recruits on British warships for the purpose of placing bombs on the ships, and I found out and reported that it cannot be done. My strict orders are that nothing is to be undertaken directed against the United States. We want to place bombs on British freight ships leaving New York harbor, and I will pay ten to fifty thousand dollars for each ship so destroyed. I expect another man or two from the other side who are to help me make the bombs, or make the bombs,' I cannot remember just which. The men did not arrive, but were apparently taken off the ships by the British; in fact, he told me this suspicion a little later, and afterwards also said that the scheme he had abandoned entirely."

I think it is very important to have a correct perspective of this case. In November, according to Fricke, the man Rodiger said that he had strict orders that nothing was to be undertaken directed against these United States.

I do not see any reason on the testimony to doubt that statement at that time.

You have the picture, if this statement of Fricke's is believed, of a man entering the country with a false passport, being a person other than Fricke originally expected, that is, other than a legitimate person, who came here for certain purposes.

[8] Those purposes, if you believe he came here for such, may have been very sinister purposes; but they had nothing whatever to do with treason against the United States of America.

If Fricke was guilty of any moral or legal wrong prior to the 6th day of April, 1917, it was under some other statute, if he was legally liable, than the statute under which he is now indicted—that is very important to bear in mind.

Under our system we can only deal with the subject-matter of the indictment; we cannot deal with anything else. If a man is accused of larceny, he cannot be convicted of bigamy.

This man is accused of treason. Prior to our entry into the war every man, as a matter of law, had the right to his own opinion as to where his sympathies would be, and he had a right to do anything lawful in that connection—he had, of course, no right to do anything unlawful.

Prior to April 6, 1917, a man may have been pro-Ally in act or in sympathy, or he might have been pro-German in act or in sympathy, and he was within his rights, however we may, as individuals, have differed with one view or the other.

In connection with pro-Ally sympathy or pro-German sympathy, any man could have engaged in any legitimate propaganda or any other legitimate act. If, on the other hand, a man was concerned with a violation of our laws of neutrality, and the evidence existed, it was open to the government to present such matters to appropriate tribunals, and, if an indictment was found, to cause a prosecution to be pursued.

So that, without going into a mass of detail, if Rodiger came here for a sinister purpose in November, 1916, as we were not at war there could under the law be no treason under this indictment possible to be committed until after the 6th day of April.

When you consider the next point you will find in the testimony, if you believe it, that Fricke came to know this man Rodiger in the manner indicated; that Rodiger called more or less frequently at the business office and the home of Fricke; later Madame Victorica called and Fricke arranged for a meeting between her and Rodiger—that is, in January, 1917; and on March 6, 1917, after diplomatic relations had ceased between Germany and ourselves, there came, if you believe the testimony, to Fricke the sum of $10,000 from Berlin. That was at that time a lawful transaction. The government was permitting radio communication between Nauen, Germany, which is near Berlin, and this country, and communication between Nauen and Sayville; and I think there were some other radio stations between the two countries.

So the transaction was in itself lawful. But when you get your minds to April 6th you are entitled to consider the sequence of events on the question of what was within Fricke's knowledge as to who Rodiger was and what Rodiger's purposes were. What I am endeavoring to do is to make clear that all these events that preceded our declaration of war, viewed in their worst possible light, do not in any manner charge the defendant with any crime for which he may be here convicted, but that those events must be carried in mind in order that you may determine what on April 6th was the knowledge of Fricke as to Rodiger, and what was his intent after that in giving this money to Rodiger, and borrowing, if you believe it, $3,000 to lend or give to Fricke; and in addition, in giving him small sums for some time afterwards.

In addition to that, it is a question of knowledge; what did he know was the purpose and mission of Rodiger after this country went into the war?

It is true that the $10,000 referred to in the indictment and testimony belonged to Rodiger, but the payment of any of it after April 6th, with the knowledge and intent of aiding Wessels in a manner which would be contrary to the interests of this country, cannot be justified as a matter of law; whatever had happened before, it became the duty of the defendant, in any event, not to adhere to an enemy of this country, and not to give that enemy aid and comfort; and whatever happened before, whether innocent or not, could be wiped off the slate, regarded or disregarded. Nevertheless the duty was upon the defendant after April 6, 1917, not to adhere to an enemy and give him aid and comfort.

If from all the evidence you think that he gave this money to Wessels, alias Rodiger, just as an individual, as distinguished from Wessels purposing to do some wrong against the United States, or some act for the Imperial German Government, if you believe that the payment was purely personal, of course it is not adhering to the enemy, and giving aid and comfort, in the sense of the statute; but if you believe the contrary, then it is.

Let me make the distinction very simple: During the war there were many quiet, orderly, enemy aliens, and in a good many business institutions they were discharged because the employers felt it would be unwise to keep them. If a man thus discharged had come to you or to me and said, "I am in very hard straits, lend me ten dollars or a thousand dollars," and we had done it, that of course is not adhering to the enemy. That is an innocent act, and, even though the man was an alien enemy, that was innocent because our purpose was innocent and our intent was innocent; we did not intend to do wrong. But if, on the other hand—and I am not referring to this case at all, I am only illustrating—a man came to me and said, "I am an alien enemy and you know it, and I want you to lend me a thousand dollars, or give me a thousand dollars, to do a wrong against the United States of America," that, of course, is obviously adhering to the enemy and giving him aid and comfort.

What I want to impress upon you is, when you have arrived at what you think the testimony in this case has proven to your satisfaction beyond a reasonable doubt, you must bear in mind what you shall conclude as to the knowledge Fricke had concerning this man Wessels, or Wessels' purpose and Wessels' intent after April 6, 1917; and when you have resolved that in your minds to your satisfaction beyond a reasonable doubt, then you must say to yourselves, Was what Fricke did, whatever you may find he did, of a character which indicated that his mind entertained an evil intent to do that wrong to the United States of America which consists in adhering to its enemies, giving them aid and comfort?

That brings me to the tenth overt act. We have disposed, so far as I am concerned, of the discussion of the money transactions. The tenth overt act reads as follows:

"Said Albert Paul Fricke, on May 3, 1918, willfully and knowingly falsely stated to Francis G. Caffey, an official of the United States, to wit, United States Attorney for the Southern District of New York, and to Ben A. Matthews, an agent and employé of the United States, to wit, an Assistant United States Attorney for the Southern District of New York, and to Charles De Woody, an agent and employé of the United States, to wit, Division Superintendent of the Bureau of Investigation of the Department of Justice of the United States, and to Harry J. Jentzer, an agent and employé of the United States, to wit, Special Agent of the Bureau of Investigation of the Department of Justice of the United States, and to Emma R. Jentzer, an agent and employé of the United States, to wit, Special Employé of the Bureau of Investigation of the Department of Justice of the United States, each of whom was then and there duly engaged, for and on behalf of the United States, in investigating the said Hermann Wessels, his status and citizenship, and his activities in the United States, the said Fricke then and there well knowing the aforesaid official position, agency, and employment of each of the aforesaid persons, and that each was engaged in making the aforesaid investigation for and on behalf of the United States, with intent on the part of said Fricke to deceive the same as such officials, agents, and employés: (1) That Rodiger, meaning thereby said Hermann Wessels, when said Fricke first saw him in the United States, told said Fricke that his (Rodiger's) business was about a will, that he came from Olten, Switzerland, that he was the manager for the Olten branch of the firm of F. Ad. Richter & Co., and that he was a citizen of Switzerland; (2) that ten thousand dollars received by said Fricke through Schulz & Ruckgaber for Rodiger was a remittance from Switzerland; (3) that he, the said Fricke, had not paid Rodiger any money subsequent to September, 1917; (4) that he, the said Fricke, never knew Rodiger under the name of Schroejers."

Putting the matter in lay language, this overt act means that when Fricke made his various statements on the 3d day of May, 1918, and falsely stated these four matters to which I have referred, he did that for the purpose of deceiving the officials of the government. The argument in that regard is that, if this statement was correctly taken down, the war having not only commenced, but being then in operation for over a year, Fricke had the purpose and intent of aiding this man Rodiger in such a way as to make it appear that he was a proper person to be in this country, and to conceal from the officials how the man got into the country, who he really was, what his purpose was, where the money came from, and the fact, also, that the man Rodiger was going under another alias, namely, Schroejers.

[9] That brings up this question of confessions. A confession must be full, free, and voluntary. There must be nothing about a confession which involves duress.

If you are satisfied that what Fricke said on the 3d of May was a voluntary statement, induced without fear or without promise, then you may take so much of the statement as I have left in evidence and consider it for what you think it is worth.

The same applies to all the succeeding statements.

As to the 15th of June statement, there can be no question but that was signed by Fricke, and you will remember that in addition Fricke made memoranda here and there on the side of that statement in his own handwriting, where he made some corrections of one kind or another, and the only question you have to deal with is, first, whether that statement of June 15th was voluntary or not; and, second, wheth-

er, in your judgment and opinion, the facts set forth by him were true.

If what he said on June 15th, and the other evidence in the case introduced by the prosecution, is believed by you, then what he said on May 3d, in the particulars to which I have referred, is false; although in stating that I do not mean to state an opinion, I am only making a comparison—because it is for you to determine whether what he said on the 3d day of May, 1918, was true or false in the particulars to which I have called your attention.

Now, if those statements in your opinion were false—and I always mean beyond a reasonable doubt—then you should inquire into the intent in that connection.

Why did he make a false statement? Was it because he feared that he was embroiled, and that that method would perhaps relieve him—by embroiled I mean as to matters that occurred before the war.

Or was it that he feared he was embroiled by reason of acts that had happened since the war in the way of giving the man money?

Or was it that he desired to protect the man Rodiger or what? I am repeating myself quite often in order to make myself clear. Did defendant intend, by his transactions with Wessels, if you believe the testimony as to those transactions, by his statement on May 3d, whatever credence you give to it one way or the other, by his conversation with Sanders, whatever credence you give to that, did he intend to adhere to the enemy and give him aid and comfort, and intend so to do with that evil motive which would have that purpose in it, of giving aid and comfort and adherence to the enemy?

It is to be remembered, first, that there is no proof as to anything that Rodiger did or accomplished, but that fact is not relevant upon the point as to what the intention of the defendant was. If the defendant intended to adhere to the enemy, and give aid and comfort, and did one overt act proved by two witnesses, and you are satisfied of that beyond a reasonable doubt, you must find him guilty, and it is utterly immaterial whether Rodiger did anything or did not do anything in the execution of any designs which in your judgment he may have had.

What I wish to get clear in your mind is that you are to test the acts of the defendant from the 6th day of April, 1917, as you believe them to have been proved beyond a reasonable doubt, to determine whether he adhered to Herman Wessels, alias Rodiger, an enemy, and gave him aid and comfort for the purpose of assisting the Imperial German Government and injuring the United States of America.

In that connection, to repeat for the purpose of emphasis, you are to bring your minds to the point of considering: What did the defendant know on the 6th day of April, 1917, as to the character and purpose of Wessels? What did he do thereafter in regard to the concealment of Wessels and in regard to the statements concerning Wessels and his transactions with him? And what was his intent in whatever he did after the 6th day of April, 1917? Was he moved by the evil intent of which I have spoken or was he not? [The court here charged on reasonable doubt.]