## UNITED STATES v. CRAMER.
### No. 270.

Circuit Court of Appeals, Second Circuit.
Aug. 20, 1943.

Harold R. Medina, of New York City (John McKim Minton, Jr., and John W. Jordan, both of New York City on the brief), for defendant-appellant.

Mathias F. Correa, U. S. Atty., of New York City (Richard J. Burke and Louis W. Goodkind, Asst. U. S. Attys., both of New York City, on the brief), for plaintiff-appellee.

Before SWAN, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

Appellant, Anthony Cramer, was convicted by a jury under an indictment charging treason by adhering to enemies of the United States, giving them aid and comfort, in violation of Sec. 1 of the United States Criminal Code, 18 U.S.C.A. § 1. He was sentenced to 45 years' imprisonment and fined $10,000. His appeal challenges the sufficiency of the evidence to sustain the conviction, the legal sufficiency of the overt acts submitted to the jury, the adequacy of proof of the overt acts, and the admission of alleged prejudicial evidence.

Sec. 1 of the Criminal Code provides: "Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason." This enacts the definition of treason laid down in Art. 3, § 3, cl. 1, of the Constitution of the United States, all parts of which are also here controlling, as follows: "Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court."

In substance appellant is charged with having aided and comforted Werner Thiel and Edward John Kerling, German saboteurs, by receiving and safeguarding property of Thiel, carrying out Thiel's requests and instructions to establish contact and communication with others, and giving false information to conceal his activities. Thiel and Kerling were two of the eight German saboteurs who, equipped with various high explosives and other sabotage devices for use against American industry, were landed on the shores of Florida and Long Island in June, 1942, by a German submarine, but who were all shortly apprehended, tried, and sentenced, six to death, two to long-term imprisonment. Cf. Ex parte Quirin, 317 U. S. 1, 63 S.Ct. 2, 87 L. Ed. ——.

Appellant, a naturalized citizen, was born in Germany in 1900 and served in the German army during World War I. He came to this country in 1925 with the announced intention of becoming a citizen, which he did in 1936. He first met Thiel while working in Detroit in 1929. They became fast friends; and when appellant moved to Hammond, Indiana, in 1933, he sent Thiel money to come out to work there, too. In 1934, they joined the Friends of New Germany, which subsequently became the notorious German Bund. Appellant was treasurer, but resigned in 1935, as he claims, because it was a money swindle and because he disliked its emphasis on marching and other martial activities. In 1936, he returned to his home in Germany for a short visit. While there he attended the Olympic games, to which a number of the Friends of New Germany had also come.

Upon his return in 1936, he and Thiel after an unsuccessful venture with a Florida restaurant went to New York, where they lived together or in close contact with each other until Thiel left for Germany in March, 1941—to enter a school for saboteurs, as it now appears, although appellant claims not to have known this. Appellant admits, however, that he realized during the time they were so closely associated that Thiel was an ardent Nazi. While they were in New York, appellant loaned Thiel money on a number of occasions, totaling according to an account book kept by appellant and placed in evidence, $217.50. This sum was unpaid when Thiel left for Germany.

Appellant did not see Thiel again until June 22, 1942, soon after the latter's landing in Florida from a German submarine. Appellant, testifying in his own behalf, gave a full account of the events of that day and of the ensuing week which formed the basis of his arrest. Since this presents the events in sequence, as well as in the light most favorable to him, we can well start with his story. He was in his apartment in New York City on the morning of

June 22, when he heard a strange voice call his name outside the door. He decided not to answer, and a note was then slipped under his door, reading: "Be at the Grand Central station tonight at 8 o'clock, the upper platform near the information booth, Franz from Chicago has come into town and wants to see you; don't fail to be there." Appellant claims he knew no Franz from Chicago, but wheñ evening came, curiosity got the better of him and he went to the appointed place. There Thiel met him. Appellant, astonished, sought the details of his return to this country and asked Thiel particularly whether he had come by submarine. Thiel looked startled and then with a smile put him off with the promise to give the full story later. He pressed upon appellant, however, the fact that his name was now Bill Thomas and that he was anti-Nazi.

From the station they went to the Twin Oaks Inn at Lexington Avenue and 44th Street for a drink, and while there Thiel asked appellant about his fiancee, Norma Kopp, in Westport, Connecticut; Thiel adopted appellant's suggestion that appellant write her to come to New York City, without, however, disclosing his arrival. When appellant told Thiel that agents of the Federal Bureau of Investigation had inquired about him, Thiel showed a draft registration card with the name William Thomas on it and said that was to avoid any trouble. He again put off further questions as to his reasons for coming back from Germany with the suggestion that they wait until Norma arrived and then they could discuss the whole thing over a glass of wine.

Later in their discussion of the bombings of German cities, however, Thiel let slip that "the only time I really was scared to death was when I came over here we got bombed." In appellant's own words: "One thought, it came to me in a flash, I said 'Then you have come over by submarine, haven't you?'" Again he was put off by Thiel, who apparently became irritated at his inquisitorial attitude. Appellant admits, however, that by then he was sufficiently convinced of the idea to try to broach the subject again, though unsuccessfully, by relating an experience of a submarine which he had heard over the radio. Thiel turned to the subject of his debt to appellant and stated that he could now pay it, as he had about three and a half or four thousand dollars with him. He told appellant that "if you have the right kind of connection you can even get dollars in Germany." He accepted appellant's suggestion that he place the balance in appellant's safe deposit box.

After leaving the Twin Oaks Inn they went for a drink to the Commodore Hotel, where Thiel told appellant he was staying. Before parting they walked outside the hotel and the station for a short time talking and made arrangements for a meeting the next night at the Twin Oaks Inn, as Thiel declared that he could not come to appellant's apartment because he had too many acquaintances there and did not want to be seen.

At their second meeting, June 23, they were joined by Edward Kerling (the leader of the Florida group of saboteurs) for about three quarters of an hour, and they all discussed German history. After Kerling left, Thiel told appellant he had his money in a belt on his body, and he went to the men's room to remove it. Thiel paid the bill, as he had the previous night; they walked to the street; and Thiel there handed the belt over. Thiel told appellant to hold some out from the safe deposit box for ready use. After stopping in Thompson's Cafeteria for a cup of coffee, they made arrangements to meet again two days later, on June 25.

Upon reaching home appellant took the money out of the belt and put the belt in his shoe box. The next night he counted the money, which totaled $3,670. He made a memo showing the denominations of the bills and a deduction from the total of $200 due him. The same evening he wrote Norma to come to New York, as he had "news of the most sensational nature" for her. The next day he mailed the letter and deposited the money in his box, keeping $160 for Thiel's immediate use in a book in his apartment. Appellant did not find Thiel at the appointed place that night for the simple reason that Thiel had been arrested. The next night he went again without success. Shortly after he returned home, Norma arrived and he told her Thiel was back. She was incredulous; and he could tell her only that Thiel might have come by submarine, that he had some $3,000 with him, and that he had promised a full story when he saw her. Appellant decided that night to leave a note at the Commodore Hotel for Thiel telling him to meet them the next afternoon at four o'clock. Thiel, of course, never met them.

The next night, June 27, appellant was arrested by the F. B. I. He was questioned

and lied that Thiel's name was Bill Thomas, that Thiel had not been outside the United States, and that most of the money in the bank was appellant's own and only a couple of hundred dollars was in the money belt. He admits these lies now, but asserts that they were designed solely to prevent Thiel's punishment as a draft dodger. The money and the money belt were found by the F. B. I. agents at the places in his room and in the bank to which appellant directed them.

All this, of course, is appellant's version, and he claims that he sought simply to aid Thiel as a friend and had no treasonable intentions. But strongly evidential of a state of mind hostile to the United States were three letters he had written shortly prior to these events, in which he had expressed warm support of the German army and the German people in their war.[1] Directly contradictory also to his denial that he ever knew or suspected that Thiel was an enemy agent is the testimony of Norma Kopp and of Special Agent Ostholthoff of the F. B. I. Norma Kopp testified that when she met appellant in New York he told her that Thiel had landed from a U-boat off Florida, that he had brought over money from the German Government, and that he got instructions from a "sitz," a hide-out, in the Bronx. Ostholthoff also testified that appellant had asked to speak to him alone during the F. B. I. examination and had then told him that Thiel had said he was here on a mission for the German Government and that he (appellant) thought it was to stir up unrest among the people and probably spread propaganda.

This testimony was corroborated by a written statement signed by appellant a little later that same night wherein he declared that he had a hunch Thiel was here to spread stories and circulate rumors, and that Kerling was here for the same purpose, that he also thought Thiel might have gotten the money from the German Government, and that he had told Norma Kopp of these hunches. He also stated: "I know ["knew" was scratched out] that it is wrong for a person to incite unrest among citizens by spreading stories and circulating rumors during war-time, but if Thiel had come over to the United States to engage in such activity, I would not think of reporting him, because I would never betray a friend." It is without significance that appellant did not here assert that Thiel told him he was on a mission for the German Government, for the decisive issue must be the nature of the mission and there is no inconsistence between the written statement and Ostholthoff's testimony as to the extent of appellant's knowledge or belief that the mission was in no event peaceful or lawful.

This statement was introduced in evidence by defendant, who on direct examination admitted that everything in it was true.[2] On cross-examination, however,

---

[1] Writing Thiel in Germany, November 25, 1941, appellant said that "defiance, boldness, will and sharp weapons will decide the war, and the German Army and the German people are not lacking in these," that he was "very discontent" and sat here "in pitiable comfort," and that he had refused a job in Detroit at $100 per week because "I do not want to soil my hands with war work." To his family in Germany he wrote December 3, 1941, of "the gigantic sacrifices which the glorious, disciplined German Army is making from day to day for the Homeland," that "every day here I hear the shrieks of hatred and the clamor for annihilation from the hostile foreigners," and that a lost war "means today a complete extirpation of the German nation." To a friend in Chicago he wrote April 21, 1942, objecting to conscription "after one has spent almost half a lifetime here in the States," and saying "personally I should not care at all to be misused by the American army as a world conqueror." All the letters were written in German.

[2] The record does not disclose when appellant was questioned and this statement taken by the F. B. I. agents with reference to his arraignment. Nor has the point been argued. Defendant himself introduced the statement to corroborate his own testimony, and under the circumstances the testimony as to the questioning itself was fairly founded on the statement. It may be noted, too, that appellant does not claim that the examination was overburdensome or that he was in any wise imposed upon by the agents; and at the beginning of the written statement he specifically declared that he made "the following voluntary statement," "having been previously informed that I do not have to make any statement if I do not desire to, and that anything I may say herein may be used against me. No threats or promises of any kind have been made to me in giving this statement." There is no issue, therefore, under McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. —, and United States v. Haupt, et al., 7 Cir., 136 F.2d 661, June 29, 1943; and see United States v. Hoffman, 2 Cir., 137 F.2d 416, July 26, 1943.

confronted with the particular assertions noted above, his claim was that he had made them simply to avoid appearing "empty-minded" and because "I did not know the consequences of my statement." Even in the cross-examination, however, he testified that he had a hunch Thiel was here on a mission for the German Government. And while he subsequently retracted this testimony to say simply that he had a hunch Thiel had come over on a German submarine, at the same time he admitted some suspicions in that he had asked Thiel if he was here to incite unrest and spread rumors.

■ Two elements are essential to a conviction for treason: a treasonable intent and an overt act in manifestation of that intent. From all the testimony, including appellant's own, the jury could properly find that he knew some improper enterprise was afoot and that he intended to aid the enemy in its prosecution. When one's country, though adopted, is at war, one cannot, without risk of conviction of giving aid and comfort to the enemy, freely associate even with old friends or assist them even in comparatively small ways, as by banking their funds or intermediating with others for them—once one knows or reasonably suspects them to be here in the role of illegal invaders, whether armed physically or with the more modern, but nonetheless destructive, weapon of propaganda. The jury could, therefore, properly find as it did, provided it also relied on a legally sufficient overt act, testified to by two witnesses. Appellant's attack on the sufficiency of the overt acts considered by the jury brings us to the principal issue on this appeal.

Three overt acts were submitted to the jury, with the instruction that proof of any one would be sufficient to sustain a conviction if the treasonable intent was also found. They were numbered 1, 2, and 10 in the indictment and alleged respectively:

"1. That on June 23rd, 1942 the defendant met with Thiel and Kerling at the Twin Oaks Inn at Lexington Avenue and 44th Street, in the City of New York, 'and did confer, treat and counsel' with the said Thiel and Kerling for a period of time."

"2. That on June 23rd, 1942 the defendant 'did accompany, confer, treat and counsel' with Thiel for a period of time at the Twin Oaks Inn at Lexington Avenue and 44th Street and at Thompson's Cafeteria on 42nd Street, both in the City of New York."

"10. That on June 27th, 1942 the defendant gave false information and made false statements regarding Werner Thiel to Special Agents Willis and Ostholthoff of the Federal Bureau of Investigation as follows: (1) that Werner Thiel's name was Bill Thomas; (2) that from March, 1941 until June, 1942 Thiel had been working in a factory on the west coast of the United States; (3) that during the aforesaid period Werner Thiel had not been out of the United States; (4) that the money belt given him by Werner Thiel in June, 1942 had contained only a couple of hundred dollars which Werner Thiel had owed him; and (5) that the $3,500 in the defendant's safe deposit box at the Corn Exchange Bank, on East 86th Street, belonged to him and had been obtained by him from the sale of securities because he considered it safer there than in his savings account in said bank; that the foregoing false information was given for the purpose of concealing the identity and mission of the said Werner Thiel."

■ The legal sufficiency of each one of these acts separately and of all together was challenged by appellant by appropriate motions, requests to charge, and objections to the charge as given. If any one was insufficient to support a conviction, it was reversible error for the judge to submit it to the jury, unless he had required the jury to find separately as to each, as he did not. Cf. Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232; Gilson v. United States, 2 Cir., 258 F. 588, Hough, J., certiorari denied 251 U.S. 555, 40 S.Ct. 119, 64 L.Ed. 412; Minner v. United States, 10 Cir., 57 F.2d 506. It is now impossible to say that the jury may not have convicted on the legally deficient act, if one is deficient. There is no analogy to those numerous cases in which it has been held not improper to submit a number of overt acts to the jury, although the proof established only one. Cf. Hall v. United States, 10 Cir., 109 F.2d 976; 15 C.J.S., Conspiracy, §§ 43, 90, pp. 1068, 1137, and cases cited. There it can be presumed upon a conviction that the jury has properly fulfilled its time-honored function of weighing the evidence and that its finding of guilt was based on the one sufficiently proved overt act. But the jury was never intended, nor, indeed, is it properly equipped, itself to determine the legal sufficiency, as distinguished from the evidentiary sufficiency, of the overt acts alleged.

Appellant challenges each of the overt acts relied on upon the ground that in and of itself, unaided by other evidence, it showed no treasonable intent. The converse of this contention is that any act which might have been done with an innocent purpose must be excluded. But such an interpretation is not warranted in the historical background of treason. The constitutional debates show that the framers were strongly influenced by the English law of treason, see Madison, Journal of the Federal Convention, 1787, 565, 566; and it is reasonable to suppose that they intended to give Art. 3, § 3, the same scope, as well as in effect the same phraseology, as the English statute then most recently construed in the famous Lord Preston's Case, 12 How.St.Tr. 646, 1691. There the prisoner was discovered on shipboard in Kent, bound for France, with military information on the disposition of the English forces. His defense was that no overt act was proven in the County of Middlesex, as alleged. He had, however, taken ship at Surrey-Stairs in the County of Middlesex; and Lord Chief Justice Holt held that such act, in prosecution of an intent to aid the enemy, was a sufficient overt act of treason. He said to Lord Preston (12 St. Tr. at 727): "My lord, as to the first matter that your lordship makes a question upon, whether there be any act of treason proved in Middlesex, that does depend upon the proof of your lordship's being concerned in the papers; for if your lordship had an intention in carrying these papers into France, which speaks a design to invade this realm, your lordship took boat in Middlesex at Surrey-Stairs, in prosecution of that intention, there is an overt-act in this county of Middlesex." And to the jury he said (12 St.Tr. at 740): "Ay, but gentlemen, give me leave to tell you, if you are satisfied upon this evidence that my lord was privy to this design, contained in these papers, and was going with them into France, there to excite an invasion of the kingdom, to depose the king and queen, and make use of the papers to that end, then every step he took in order to it, is high-treason, wherever he went; his taking water at Surrey-Stairs in the county of Middlesex, will be as much high-treason, as the going a ship-board in Surrey, or being found on ship-board in Kent, where the papers were taken."

The decision establishes the proposition that a treasonable intent need but be manifested by an overt act, and not that the act of itself must show the intent. The act in and of itself may be innocent; the intent with which it is committed is shown by all the surrounding circumstances, proof of which separately does not require the testimony of two witnesses. See Rex v. Vaughan, 2 Salk. 634, 91 Eng.Rep. 535, 13 St.Tr. 485, 1696, where it was held that the prisoner had committed an overt act of treason merely by cruising on the high seas for the French King, his intent as shown aliunde being to aid and assist that enemy; and compare The Case of Hugh Pine, Cro.Car. 117, 1 Hale P.C. 118, 79 Eng.Rep. 703, 1628, where charging the King with vice was held no treason, in absence of proof of a treasonable intent, with Rex v. Charnock, 2 Salk. 631, 91 Eng. Rep. 533, 1695, where words of persuasion to kill the King were held overt acts of treason, "for the bare imagination and compassing makes the treason, and any external act that is a sufficient manifestation of that compassing and imagining is an overt act." That this has also been the recent construction of the English law, see Rex v. Lynch, [1903] 1 K.B. 444, 72 L.J.K.B. 167, 20 Cox C.C. 468 (declaration and oath of allegiance to Government of South African Republic, although the basis of naturalization, held overt acts of aiding and comforting the enemy), and Rex v. Casement, [1917] 1 K.B. 98, 86 L.J.K.B. 467 (Lord Chief Justice Reading in summing up to the jury, see Trial of Sir Roger Casement, 1917, ed. by Knott, p. 183: "Overt acts are such acts as manifest a criminal intention and tend towards the accomplishment of the criminal object").

The early decisions in our own courts follow this construction. United States v. Lee, C.C.D.C., 26 Fed.Cas. page 907, No. 15,584 (purchase of melons, an act innocent enough in itself, held sufficient as overt act; intent to deliver to enemy established by other circumstances); see Case of Fries, C.C.Pa., 9 Fed.Cas. 826, 914, No. 5,126 (per Circuit Justice Iredell): "The fact is that, when the overt act is proved by two witnesses, it is proper to go into evidence to show the course of the prisoner's conduct at other places, and the purpose for which he went to that place where the treason is laid, and if he went with a treasonable design, then the act of treason is conclusive."

In Ex parte Bollman, 4 Cranch 75, 8 U.S. 75, 2 L.Ed. 554, Mr. Chief Justice Marshall, in defining treason by levying war, held that once a body of men had

assembled for the treasonable purpose, any one who performed any act in furtherance of that purpose, *however minute and however remote from the scene of the action,* is a traitor. This decision was further explained in United States v. Burr, C.C.Va., 25 Fed.Cas. page 55, No. 14,693, where the sole overt act alleged was an unlawful assemblage, but the defendant was not shown to have been present. The Chief Justice instructed the jury that there was a failure of proof of the overt act; but he pointed out that the defendant might have been convicted upon allegation and proof of an act in furtherance of the design, remote and minute though it be in its bearing on the unlawful assemblage. See, also, In re Charge to Grand Jury, C.C.Mass., 30 Fed. Cas. page 1049, No. 18,277. Defendant cites these cases to show that, since conviction of treason by levying war requires an actual showing of force, by analogy conviction of treason by aiding and comforting the enemy requires an act in and of itself hostile to the United States. But a defendant to be convicted of treason by levying war need not himself have been engaged in the treasonable assemblage, but may only have aided it in some remote and minute fashion. Where treason by aiding and comforting the enemy is concerned, the requirement corresponding to a warlike assemblage must be simply that there be an enemy to aid and comfort. Any act, then, which by fair construction is in any manner in furtherance of a hostile design of such enemy is a sufficient overt act, to be proved by the testimony of two witnesses; and the purpose with which the act is done may be gathered aliunde from all the circumstances.

In the most recent case on this point, Stephan v. United States, 6 Cir., 133 F.2d 87, certiorari denied 63 S.Ct. 858, 87 L.Ed. ——, rehearing denied 63 S.Ct. 1172, 87 L.Ed. ——, the court accepted without discussion as overt acts properly submitted to the jury that the defendant escorted an escaped German prisoner from the meeting place to his car, and that he took him to restaurants and clubs and entertained him and also concealed his identity at these places. So, also, in United States v. Fricke, D.C.S.D.N.Y., 259 F. 673, Mayer, J., submitted to the jury as overt acts of aiding and comforting the enemy that defendant held money on deposit for a German spy and paid it out to him, and that he lied to government officials as to the identity and activities of such spy, with intent to deceive such officials. In both cases attention was directed solely to the sufficiency of proof of the acts. Had there been any question in either case of their legal sufficiency, we cannot but believe that the court would have raised it, for where the death penalty is applicable, a court will notice all possible errors even though not properly raised. Stephan v. United States, supra, 133 F.2d at page 90. The Stephan case was before the Supreme Court four times—once on the petition for certiorari, 63 S.Ct. 858, 87 L.Ed. ——, once on petition for a stay of execution, which was granted, 63 S.Ct. 964, 87 L.Ed. ——, once on the petition for a rehearing, 63 S.Ct. 1172, 87 L.Ed. ——, and once on application for allowance of an appeal direct from the district court, which was denied, 63 S.Ct. 1135, 1136, 87 L.Ed. ——. In the latter case the Court observed in a per curiam opinion that it had rejected the petition for certiorari "after careful consideration of the case." In the light of this background, we do not feel we should hold to the contrary because of a dictum, much pressed upon us, as it was on the court in the Stephan case, in United States v. Robinson, D.C.S.D.N.Y., 259 F. 685, 690, even if, as is doubtful, the statement relied on is against the views here stated.[3]

---

[3] In that case Judge Learned Hand was actually passing on a point discussed later in this opinion; but before considering it, he expressed grave doubt of certain acts charged "that do not openly manifest any treason," and questioned whether the prosecution could charge as an overt act "a step taken in execution of the traitorous design, innocent in itself, and getting its treasonable character only from some covert and undeclared intent." This language does, of course, state the problem, albeit in abstract and general terms; just how far he would have gone, if pressed to

it, in applying his thought is not clear. Appellant says one of the acts he questioned (though there is some ambiguity in his referent) charged meeting and conferring with one O'Leary. But O'Leary was not a saboteur from an enemy submarine; he seems at most a person interested in enlisting German support for the cause of Irish freedom. Also Judge Hand held "good as a pleading under any rule" a charge that the defendant embarked from Rotterdam bound for New York, carrying with him messages from the German Government with intent to convey them to certain Ger-

Any interpretation of Art. 3, § 3, which would require the overt act itself to demonstrate the treasonable intent would erect a requirement of quantity of proof into a limitation on the crime itself, rendering it as a practical matter almost non-existent. One would be hard put to it to think of an act, short of openly joining the armed forces of the enemy,[4] which would surely show treason if resort cannot be had to background evidence of intent. And if such separation of proof into component parts is necessary, it would follow that the overt act would have to be proved first and the jury then pass upon the sufficiency of the intent thereby shown before any other evidence of intent be admitted. See Case of Fries, supra, 9 Fed.Cas. at page 916. For intent is always for the jury, and cannot be adjudged by the court in passing on the legal sufficiency of the overt act. In effect the overt act would then have to comprehend the whole treason, and proof aliunde of intent would be superfluous. This would mean an extension of the scope of the two-witness rule beyond anything heretofore known in its varied history, not to speak of a retrogression in the progressive emphasis on the quality of the witnesses to a crime, rather than on their numerical quantity. See 9 Holdsworth's History of English Law, 1926, 203-211; 7 Wigmore on Evidence, 3d Ed. 1940, 241-273. We believe in short that no more need be laid for an overt act of treason than for an overt act of conspiracy, which has never been thought of as itself establishing the unlawful scheme. The requirement will then be, as it is in terms, one of limitation of the number of witnesses to it, not some difference in kind applicable to this offense. Hence we hold the overt acts relied on were sufficient to be submitted to the jury, even though they perhaps may have appeared as innocent on their face.

Something more should be said as to overt act 10, in view of appellant's reliance particularly upon United States v. Leiner, Cr. No. 113-120, D.C.S.D.N.Y., 1943, Clancy, J., where the court ruled out as overt acts misstatements of a prisoner to his captor upon the grounds that the prisoner knew the enemy allegedly aided had already been apprehended and beyond aid, and that the misstatements were such as to exculpate himself. Appellant urges that these conditions apply here. But they are at best indicia of intent, which is for the jury. And in any event, it is a non sequitur to suppose that because an enemy has been apprehended no aid can be extended him by misstatements as to his identity and activities. Certainly they may thwart his conviction and speed his release to commit further depredations. So, also, any general exception for misstatements tending to exculpate the prisoner would be somewhat at variance with the settled notion that a conviction of treason is proper even though the defendant is moved to commit the treason by pecuniary motives. In re Charge to Grand Jury, C.C.S.D.N.Y., 30 Fed.Cas. page 1032, No. 18,270; In re Charge to Grand Jury, C.C.S.D.Ohio, 30 Fed.Cas. page 1036, No. 18,272. And even if we should assume an immunity where facts are misstated without thought of aiding the enemy and solely for self-preservation, the case here is otherwise. Defendant claims that he lied as to Thiel's identity to conceal Thiel's violation of the draft law. But he continued to deny Thiel's return to Germany in 1941 and his ownership of the money in the deposit box even after he was informed that the F. B. I. knew his identity. And he makes no claim that this was to save himself.

Each of the overt acts was sufficiently proved by the testimony of two witnesses. While the two phases of overt act 2 were observed by different sets of witnesses, the discussion in the Twin Oaks Inn by Agents Willis and Rice, and the further discussion in Thompson's Cafeteria by Agents Rice and Stanley, we perceive no reason in policy or law to require the same two witnesses to the whole overt act. If the policy behind the two-witness rule is to protect the accused fully against conviction upon the false testimony of one hostile witness, certainly this multiplication of witnesses will still better insure the result. There is nothing contra in the holding in United States v. Robinson, supra, 259 F. at page 694, that "it is necessary to

---

man agents, though it would seem that he expressed disapproval of the sufficiency of a charge of defendant's arrival in New York with these same messages and the same intent. If anything, the latter would seem more decisive than the former, though to either, proof of the intent appears requisite.

[4] The government points out that even this act would not necessarily show treason because of its possible use by an American spy.

produce two direct witnesses to the whole overt act," for this was directed at the attempted proof of separable parts of the overt act by different witnesses, *one for each part.* Judge Learned Hand, however, went on to say, "It may be possible to piece bits together of the overt act, but, if so, each bit must have the support of two oaths; on that I say nothing." See, also, 7 Wigmore on Evidence, 3d Ed. 1940, § 2038, page 271.

■ Nor is it significant that some of the witnesses viewed the conferences for but a few minutes, though the conferences actually continued for a total of some three hours. The indictment charged simply that appellant conferred, treated, and counseled "for a period of time," first with Thiel and Kerling and then with Thiel alone. Under the circumstances and in the light of the evidence as to intent, proof for a short period of time is adequate.

■ Furthermore, overt act 2 is not insufficient because only one witness testified as to the last clause that the $3,500 (which appellant falsely claimed he owned) was kept by him in a safe deposit box "because he considered it safer there than in his savings account in said bank." The substance of the act was that appellant lied to government officials to cover up for Thiel. It was proved in all important respects by two witnesses. By analogy to those cases in which proof of but one of the overt acts of an indictment has been held sufficient, we see no reason why we should not disregard the failure to establish this allegation of overt act 10, in view of the other proved allegations; it is now mere surplusage. The jury could not conceivably have relied upon it solely to establish the act, for it presupposed appellant's claim of ownership, which was in fact proved by two witnesses.

■ Other errors assigned deal with the admission of testimony. Shortly after the opening of the trial the government introduced a mass of testimony as to the background and training of the saboteurs, the method which they used to enter the country, and the wide variety of tools of destruction which they brought with them. Appellant's counsel objected after a time to a continuance of this line of testimony, on the ground that it was unnecessarily prejudicial and inflammatory, especially since he conceded that the saboteurs were enemies of the United States. The objection was overruled. All told, some 75 pages of the testimony, which in toto comprises over 700 pages in the record, were devoted to this topic. We are not convinced, however, that the district court thereby abused its discretion. It was essential that the government prove that Thiel and Kerling were enemies of the United States, and it could not safely rely for this on any concession by appellant's counsel.

■ During the trial the Government's witness Powers, a "minute man" selling war bonds and stamps, was also allowed to testify over objection that when he called at appellant's apartment on June 22, 1942— the day appellant met Thiel—appellant had said he was not interested in buying even a war stamp and had shut the door. While we may grant appellant's contention that this did not of itself show a treasonable intent, it was certainly evidence for the jury as to appellant's state of mind at this crucial time. It may be noted that Norma Kopp later testified that appellant had told her he had thrown the minute man out, and that she had originally thought that this was the cause of appellant's arrest by the F. B. I., and further that appellant himself testified that he related the incident to Thiel, who said: "Well, why did you do that? Don't you think it is very dangerous to be unpatriotic today?" These were normal reactions to the incident; in any event, we think the jury was entitled to draw its own conclusions from it.

■ On cross-examination appellant was asked whether he was ever particularly interested in the law of treason. When he answered in the negative, the prosecution introduced in evidence a copy of the Constitution taken from his room. On it the section concerning treason was bracketed in ink. Appellant admitted he had done this about a year and a half previously, which would be about March, 1941, the time Thiel left for Germany. At least five other unrelated provisions were also marked. The exhibit was properly admitted to impeach appellant's answer and to show his state of mind at least as of the time he marked the copy, which under the circumstances was not too remote to be relevant to the events of June, 1942.

■ Appellant was also required on cross-examination to answer the question, allowed over objection, whether he had not received a letter in 1941 from his nephew Norbert in Germany warning him that his

letters discussing the United States were so unfriendly that Norbert's father feared he would be placed on the black list. Of course, these expressions of opinion could not properly bind appellant; and the objection might wisely have been sustained. But the district court has a wide discretion to admit testimony on cross-examination; and since the testimony prior to the objectionable question shows that it was intended to refresh appellant's recollection as to whether he had written any letters of a nature unfriendly to the United States, other than that to Thiel on November 25, 1941, we cannot say that there was here an abuse of the district court's discretion or grounds for mistrial. In any event, the ruling was not so prejudicial as to outweigh all the other circumstances requiring an affirmance.

Affirmed.